**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on February 23, 2018, which may be different from its entry on the record.**

**IT IS SO ORDERED.**

**Dated: February 23, 2018**



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Case No. 10-50494 |
| | ) | |
| FAIR FINANCE COMPANY, | ) | Chapter 7 |
|     Debtor. | ) | |
| _____ | ) | Judge Jessica E. Price Smith |
| | ) | |
| BRIAN BASH, TRUSTEE, | ) | District Court Case No. 5:12-cv-987 |
|     Plaintiff, | ) | Chief Judge Patricia A. Gaughan |
| | ) | |
| v. | ) | Adversary Proceeding No. 12-5101 |
| | ) | Judge Arthur I. Harris |
| TEXTRON FINANCIAL CORP., | ) | |
|     Defendant. | ) | |

PROPOSED CONCLUSIONS OF LAW RECOMMENDING THAT THE
DISTRICT COURT: (1) GRANT IN PART AND DENY IN PART DEFENDANT
TEXTRON FINANCIAL CORPORATION'S MOTION FOR SUMMARY
JUDGMENT; (2) DENY PLAINTIFF TRUSTEE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT; AND (3) DEFER RULING ON THE PENDING
MOTIONS *IN LIMINE*

This proceeding is currently before the undersigned bankruptcy judge for

recommendations regarding (1) the motion of defendant Textron Financial

Corporation ("Textron") for summary judgment; (2) the motion of the plaintiff trustee ("Trustee") for partial summary judgment; and (3) several motions *in limine* filed by Textron related to potential expert testimony. For the reasons that follow, the undersigned judge submits these Proposed Conclusions of Law recommending that the district court:

(1a)  deny Textron's motion for summary judgment with respect to the Trustee's theory for actual fraudulent transfers based on novation (Count I), ¶¶ 52-107;

(1b)  grant Textron's motion for summary judgment with respect to the Trustee's theories for actual fraudulent transfers not based on novation (Count I), ¶¶ 108-18;

(1c)  grant Textron's motion for summary judgment with respect to the Trustee's civil conspiracy claim (Count II), ¶¶ 119-62;

(1d)  deny Textron's motion for summary judgment with respect to the Trustee's claims for equitable subordination or disallowance of any potential Textron proof of claim (Counts III and IV), ¶¶ 163-64;

(2)  deny the Trustee's motion for partial summary judgment, ¶¶ 165-212; and

(3)  defer ruling on the pending motions *in limine*, ¶¶ 213-33;

## JURISDICTION

1.  The district court has jurisdiction over this action pursuant to 28 U.S.C. § 1334. The undersigned bankruptcy judge has authority to issue proposed conclusions of law pursuant to 28 U.S.C. § 157(c); Rule 9033 of the Federal Rules of Bankruptcy Procedure; Local General Order No. 2012-7, dated

April 4, 2012; and the Orders of the district court dated May 20, 2014, and October 4, 2016, re-referring this matter for pretrial supervision and recommendations on all dispositive motions (Case No. 5:12-CV-987, ECF Nos. 232 and 267). *See also Exec. Benefits Ins. Agency v. Arkison*, __U.S.__, 134 S. Ct. 2165 (2014) (procedure under 28 U.S.C. § 157(c) by which bankruptcy judge hears non-core matters and submits proposed findings of fact and conclusions of law to the district court "may be applied naturally to *Stern* claims").

## PROCEDURAL HISTORY

2.      On February 7, 2012, the Trustee filed this adversary complaint against three defendants. Following the district court's withdrawal of its reference pursuant to 28 U.S.C. § 157(d), the first defendant, Textron, was dismissed on November 9, 2012, pursuant to a memorandum of opinion and order entered by U.S. District Judge Patricia A. Gaughan. *Bash v. Textron Fin. Corp.*, 483 B.R. 630 (N.D. Ohio 2012).

3.      On January 15, 2015, the district court largely denied cross-motions for summary judgment filed by the Trustee and the second defendant, Fortress Credit Corporation ("Fortress"). *Bash v. Textron Fin. Corp.*, 524 B.R. 745 (N.D. Ohio 2015).

4.      On June 8, 2015, the bankruptcy court approved a settlement between the Trustee and Fortress that had been negotiated with the assistance of the district

3

court.  Case No. 1:10-BK-50494, ECF No. 1713.

5.      On July 23, 2015, the district court entered an order dismissing the Trustee's claims against Fortress with prejudice.  Case No. 5:12-CV-987, ECF No. 258.

6.      On July 24, 2015, the district court dismissed the Trustee's claims against the third defendant, Fair Facility I, LLC ("Fair Finance SPE"), which never entered an appearance, filed an answer, or otherwise defended itself against the claims raised in this proceeding.  Case No. 5:12-CV-987, ECF No. 260.  The dismissal of Fair Finance SPE completed the dismissal of all claims and all parties, thereby making the 2012 dismissal of Textron a final appealable order.

7.      On August 3, 2015, the Trustee appealed the 2012 order dismissing the claims against Textron to the Sixth Circuit.  Case No. 5:12-CV-987, ECF No. 261.

8.      On August 23, 2016, the Sixth Circuit issued an opinion affirming in part and reversing in part the district court's 2012 order dismissing the Trustee's claims against Textron.  *Bash v. Textron Fin. Corp. (In re Fair Finance)*, 834 F.3d 651 (6th Cir. 2016).

9.      On September 23, 2016, the Sixth Circuit denied Textron's petition for rehearing and motion to certify questions of state law to the Ohio Supreme Court.

10.  On October 3, 2016, the Sixth Circuit issued its mandate and remanded this proceeding to the district court.  The mandate was entered on the district court docket on October 4, 2016.  Case No. 5:12-CV-987, ECF No. 266.

11.  On October 4, 2016, the district court referred this matter to the undersigned bankruptcy judge "for pretrial supervision" and to issue "a Report and Recommendation on all dispositive motions filed in this case."
Case No. 5:12-CV-987, ECF No. 267.

12.  On November 4, 2016, the district court granted the Trustee's unopposed motion for leave to file a second amended complaint against Textron.
Case No. 5:12-CV-987, ECF No. 270.

13.  On December 19, 2016, Textron filed a motion to dismiss the second amended complaint.  Case No. 5:12-CV-987, ECF No. 274.

14.  On March 29, 2017, the undersigned judge issued proposed conclusions of law recommending that the district court deny Textron's motion to dismiss the Trustee's second amended complaint, with the exception of reaffirming the district court's earlier decision that the Trustee is not entitled to punitive damages for avoidance claims under 11 U.S.C. §§ 550 and 544.
Case No. 5:12-CV-987, ECF No. 287.

15.  On May 30, 2017, the district court accepted the recommendation that Textron's motion to dismiss be denied.  Case No. 5:12-CV-987, ECF No. 298;

5

*Bash v. Textron Fin. Corp.*, 575 B.R. 814 (N.D. Ohio 2017).

16.     On June 30, 2017, Textron filed its answer to the Trustee's second amended complaint.  Case No. 5:12-CV-987, ECF No. 299.

17.     During the same time that the parties were briefing Textron's motion to dismiss the second amended complaint, the undersigned judge established a discovery schedule, with a goal of completing all fact discovery, all expert discovery, and all dispositive motion briefing by the end of calendar year 2017.  Adv. Pro. 12-5101, ECF No. 139.

18.     The scheduling order also provided for mediation after the close of fact discovery.  The parties conducted mediation in September 2017 with a private mediator that the parties themselves selected.  Despite encouragement from the undersigned judge that this was the last best chance to resolve this litigation, the mediation resulted in no consensual resolution.  *See* Adv. Pro. 12-5101, ECF No. 200, Transcript of Record at 32-35.

19.     On November 3, 2017, Textron filed a motion for summary judgment.  Case No. 5:12-CV-987, ECF No. 300.  The Trustee also filed his own motion for partial summary judgment.  Adv. Pro. 12-5101, ECF No. 223.  Textron also filed several motions *in limine* related to potential expert testimony.  Case No. 5:12-CV-987, ECF Nos. 304, 306, 308, and 310.  All of these motions have now been fully briefed.

## STATUS OF BANKRUPTCY CASE

20.     The underlying bankruptcy case was filed on February 8, 2010.  In December 2015, the Trustee made an interim distribution totaling $18 million to approximately 5,180 general unsecured creditors, representing a pro rata distribution of about 8-9 percent.  Case No. 10-50494, ECF No. 2098.  With the retirement of Judge Pat E. Morgenstern-Clarren on May 1, 2017, the underlying bankruptcy case was reassigned to Judge Jessica E. Price Smith.   In October 2017, the bankruptcy court approved a second interim distribution to general unsecured creditors totaling $5 million, representing an additional pro rata distribution of about 2-3 percent.  Case No. 10-50494, ECF No. 2407.

21.     The bankruptcy court has approved seven interim distributions of attorney's fees to the Trustee's counsel, Baker & Hostetler LLP, totaling more than $26 million.  Case No. 10-50494, ECF No. 2403 at 5-6 and ECF No. 2423 at 3.  The bankruptcy court has also approved another $5.6 million in attorney's fees for Baker & Hostetler LLP, which have been held back, for a total of more than $32 million.  Case No. 10-50494, ECF No. 2403 at 4 and ECF No. 2423 at 3. In addition, the bankruptcy court has approved the reimbursement of more than $1.3 million in expenses incurred by Baker & Hostetler LLP.  Case No. 10-50494, ECF No. 2403 at 5-6 and ECF No. 2423 at 3.

22.     The Trustee's claims against Textron constitute the largest potential

7

asset in the bankruptcy estate that has yet to be liquidated.

THE SECOND AMENDED COMPLAINT

23.     The second amended complaint consists of four claims for relief. These claims for relief are largely identical to Counts I, XVI, XIX, and XXI of the first amended complaint that were the subject of the district court's 2012 order dismissing all claims against Textron, as well as the Sixth Circuit's 2016 decision affirming in part and reversing in part the decision of the district court.

24.     The second amended complaint excludes the claims previously brought against Fortress and Fair Finance SPE, the dismissed defendants, and includes a few additional allegations within the same four claims for relief. Case No. 5:12-CV-987, ECF No. 270 (redline attachment).

25.     Count I, which is largely identical to Count I of the first amended complaint, seeks avoidance and recovery of actual fraudulent transfers from Textron under 11 U.S.C. § 544(a) and (b)(1), Ohio Rev. Code § 1336.04(A)(1), 11 U.S.C. § 550(a), and 11 U.S.C. § 551.  Unlike Count I of the first amended complaint, Count I of the second amended complaint does not include a claim for treble damages under Ohio Rev. Code § 2307.61.

26.     Count II, which is largely identical to Count XVI of the first amended complaint, seeks damages against Textron for civil conspiracy.

27.     Count III, which is largely identical to Count XIX of the first

8

amended complaint, seeks equitable subordination of any filed or scheduled

claims of Textron under 11 U.S.C. § 510(c).

28.    Count IV, which is largely identical to Count XXI of the first

amended complaint, seeks disallowance of any filed or scheduled claims of

Textron under 11 U.S.C. § 502(d) .

## THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPLY TO THIS PROCEEDING

29.    This proceeding remains subject to the Federal Rules of Bankruptcy

Procedure, regardless of whether the proceeding is being heard by a district judge

or a bankruptcy judge.  *See* Fed. R. Bankr. P. 1001; Fed. R. Civ. P. 81(a)(2);

*Rosenberg v. DVI Receivables XIV, LLC*, 818 F.3d 1283, 1287 (11th Cir. 2016)

("Moreover, the Federal Rules of Civil Procedure provide for the primacy of the

Federal Bankruptcy Rules in bankruptcy proceedings adjudicated in district

court."); *Diamond Mortg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1240-41 (7th Cir.

1990) (explaining that the Bankruptcy Rules apply to cases and proceedings

before district judges or bankruptcy judges); *Owens-Ill. v. Rapid Am. Corp., (In re

Celotex Corp.)*, 124 F.3d 619, 629-30 (4th Cir. 1997) (same); *Phar-Mor, Inc. v.

Coopers & Lybrand*, 22 F.3d 1228, 1236-37 (3d Cir. 1994) (same);

*Redhawk Global, LLC v. World Projects Int'l*, 495 B.R. 368, 374 (S.D. Ohio 2013)

(same); *VFB LLC v. Campbell Soup Co.*, 336 B.R. 81, 83 (D. Del. 2005) (applying

9

the bankruptcy rules in a fraudulent conveyance action that originated in district court); *see also* 1987 Advisory Committee Note to Fed. R. Bankr. P. 9001(4) ("Since a case or proceeding may be before a bankruptcy judge or a judge of the district court, 'court or judge' is defined to mean the judicial officer before whom the case or proceeding is pending.").

## BRIEF SUMMARY OF PERTINENT UNDISPUTED FACTS

30.     Given the district court's familiarity with this litigation, the undersigned judge will dispense with a lengthy recitation of undisputed facts.  In addition, because there are cross-motions for summary judgment, the district court must take care in each instance to draw all reasonable inferences against the party whose motion is under consideration.  *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).  Accordingly, the undersigned judge will provide a brief summary of pertinent undisputed facts immediately below and will address specific material facts in the context of each party's motion for summary judgment, taking care to draw all reasonable inferences against the party whose motion is under consideration.

31.     Unless otherwise indicated, the following pertinent facts are undisputed.

32.     The debtor was an Ohio factoring company founded in 1934. Adv. Pro. 12-5101, ECF No. 234 at 2.  The debtor would purchase accounts

receivable from merchants at a discount and collect on the receivables. *Id.* To finance this business, the debtor issued debt securities called "V-Notes" to Ohio investors. *Id.* at 3. The Debtor was required to apply to and register with the Ohio Division of Securities to issue the V-Notes. Case No. 5:12-CV-987, ECF No. 301, Exhibit D at 23 (Heuerman Dep.). The debtor would prepare offering circulars and give them to the Ohio Division of Securities for advance review before the debtor provided them to potential investors. *Id.* at 82-84. The offering circulars contained financial and other information regarding the Debtor and the V-Note program. Case No. 5:12-CV-987, ECF No. 301, Exhibit E at 18-19 (Kaffen Dep.).

33.    In January 2002, Fair Holdings, Inc. purchased the debtor from the debtor's prior owners. Case No. 5:12-CV-987, ECF No. 271 at 4 (Second Amended Complaint). Fair Holdings, Inc. was wholly owned by DC Investments, LLC, which was in turn wholly owned by Tim Durham and James Cochran. *Id.*

34.    On January 7, 2002, Textron and another lender, United Bank (later known as Unizan) entered into a loan and security agreement (the "2002 Agreement") with the debtor and Fair Holdings, Inc. Case No. 5:12-CV-987, ECF No. 301, Exhibit F. The 2002 Agreement created a revolving line of credit on which the debtor could draw up to $22 million. *Id.* at 2.

35.    Under the 2002 Agreement, Textron was granted a security interest in

11

all of the present and future assets of the debtor and Fair Holdings, Inc. *Id.* at 6-8. This security interest was perfected by filing a UCC-1 financing statement with the Ohio Secretary of State. Case No. 5:12-CV-987, ECF No. 301, Exhibit N. Paragraph 11(c) of the 2002 Agreement expressly provided that the 2002 security interest shall extend to all future obligations of the debtor:

> It is Borrower's express intention that this Agreement and the continuing security interest granted hereby . . . shall extend to all future obligations of Borrower to Lenders intended as replacements or substitutions for said Obligations, whether or not such Obligations are reduced or entirely extinguished and thereafter increased or reincurred.

Case No. 5:12-CV-987, ECF No. 301, Exhibit F at 7.

36. The Trustee has never alleged that the debtor's grant of a security interest under the 2002 Agreement or any repayments of advances under the 2002 Agreement were fraudulent or avoidable.

37. On January 6, 2004, Textron, the debtor, and Fair Holdings, Inc. executed the First Amended and Restated Loan and Security Agreement (the "2004 Agreement"). Case No. 5:12-CV-987, ECF No. 301, Exhibit H. Under the 2004 Agreement, the total amount available to be borrowed at any one time was reduced from $22 million to $17.5 million; however, Textron's own obligation increased from the previous $12 million. *Id.* at 4. In connection with the 2004 Agreement, Unizan assigned and Textron purchased all rights acquired by

12

Unizan under the 2002 Agreement.  Case No. 5:12-CV-987, ECF No. 301,

Exhibit P (Unizan Payoff Letter).  The balance that the debtor owed to Textron in

January 2004 remained outstanding.  Case No. 5:12-CV-987, ECF No. 301,

Exhibit Q (2004 Loan Ledger Report).

38.    No new UCC-1 financing statements were filed in connection with

the 2004 Agreement, and no termination statement was filed concerning the

2002 UCC-1 until the borrower/lender relationship between Textron and the

debtor ended in July 2007.  Case No. 5:12-CV-987, ECF No. 301, Exhibit U.

39.    Some of the relevant terms of the 2004 Agreement provided:

- The parties' "desire [was] to amend and restate" the 2002 Agreement, acknowledging that the 2002 Agreement granted a security interest in Debtor's assets to the Secured Lender;

- Unlike the 2002 Agreement, which used the term "Closing Date" to define the date on which the transaction was closed and funded, the Restatement used the term "Effective Date."

Case No. 5:12-CV-987, ECF No. 301, Exhibit H at 1.

40.    The 2004 Agreement included as an exhibit a legal opinion provided

by the debtor's counsel, John Egloff, which stated that:

Neither the making nor performance of the Loan Documents or the transactions contemplated thereby will adversely affect the validity or priority of the security interests granted to and obtained by Lender as a result of the making and performance of the Original Loan Agreement.

*Id.* at 30-35.

13

41. This legal opinion was a condition precedent to Textron making any loan under the 2004 Agreement. *Id* at 15.

42. On July 20, 2007, the debtor paid Textron the full balance due on the loan. Case No. 5:12-CV-987, ECF No. 301, Exhibit I (Fair Payoff Letter). In connection with the final payoff, the debtor and Fair Holdings, Inc. executed a "Borrower's Consent and Release." *Id.*

43. On July 25, 2007, Textron filed a UCC-3 termination statement indicating that the 2002 security interest was no longer in effect. Case No. 5:12-CV-987, ECF No. 301, Exhibit U.

44. In February 2008, Fortress replaced Textron as a secured lender. Case No. 5:12-CV-987, ECF No. 271 at 75.

45. The debtor continued operations until the FBI raided the debtor's office on November 29, 2009. *Id.* at 76.

46. The Trustee has conceded that there were no innocent insiders within Fair Finance who had sufficient authority to stop the fraud had they known of it. *See* Adv. Pro. 12-5101, ECF No. 199 at 1 (Letter to Judge Harris from Trustee). Nevertheless, the Trustee argues that the presence of an innocent decision maker outside the corporation in the form of a state regulator might suffice to avoid application of the sole actor doctrine under Ohio law. *See id.*

14

## SUMMARY JUDGMENT STANDARD

47.     Federal Rule of Civil Procedure 56, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 was amended in 2010; however, "[t]he commentary to Rule 56 cautions that the 2010 amendments were not intended to effect a substantive change in the summary-judgment standard." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012). "A court reviewing a motion for summary judgment cannot weigh the evidence or make credibility determinations." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569 (6th Cir. 2012) (citation omitted). "Instead, the evidence must be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party." *Id.* at 570. "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Yeschick v. Mineta*, 675 F.3d 622, 632 (6th Cir. 2012) (citation and internal quotation marks omitted).

> [C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. . . . This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine

15

whether there is a genuine issue for trial." *Anderson* [*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986)]. Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). In making that determination, a court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); *see also Anderson* [*v. Liberty Lobby*, 477 U.S. at 255].

*Tolan v. Cotton*, \_\_U.S.\_\_, 134 S. Ct. 1861, 1866 (2014) (citations omitted).

48.    "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Taft*, 929 F.2d at 248.  "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id.*; *accord Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016).

49.    In addition, in most situations in which the moving party seems to have discharged its burden of demonstrating that no genuine issue of fact exists, the court still has discretion to deny a Rule 56 motion.  *See* Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 2728 n.11-12 (3d ed. 1998). "This is appropriate since even though the summary-judgment standard appears to have been met, the court should have the freedom to allow the case to continue when it has any doubt as to the wisdom of terminating the action prior to a full trial."  *Id.*; *accord Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir.

16

1990) (quoting 6 Moore, Taggart, & Wicker, *Moore's Federal Practice* ¶ 56.15[8]

(2d ed. 1988)):

> The trial court may . . . exercise a sound discretion in denying
> summary judgment where, although the movant may have technically
> shouldered his burden, the court is not reasonably certain that there is
> no triable issue of fact; where a portion of an action may be ripe for
> summary judgment but it is intertwined with another claim that must
> be tried; and in certain other situations.

*Compare Anderson v. Liberty Lobby*, 477 U.S. at 255 ("Neither do we suggest that

the trial courts should act other than with caution in granting summary judgment

or that the trial court may not deny summary judgment in a case in which there is

reason to believe that the better course would be to proceed to a full trial."), *with*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) ("In our

view, the plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial.").

## DISCUSSION

### I. TEXTRON'S MOTION FOR SUMMARY JUDGMENT

50.    In its motion for summary judgment, Textron first asserts that it is

entitled to summary judgment in its favor on the Trustee's actual fraudulent

transfer claim (Count I).  Simply stated, Textron asserts that the debtor's loan

17

repayments were made pursuant to a valid lien in 2002 that was never extinguished until all loan repayments were completed in 2007, and thus the loan repayments are not avoidable transfers under Ohio law. Textron also asserts that there is no basis under Ohio law for invalidating its 2002 lien based upon alleged bad faith in 2004 or anytime later.

51.     As explained more fully below, the undersigned judge recommends that the district court:

- deny Textron's motion for summary judgment with respect to the Trustee's theory for actual fraudulent transfers based on novation; and

- grant Textron's motion for summary judgment with respect to the Trustee's theories for actual fraudulent transfers not based on novation.

### A.  The Trustee's Theory for Actual Fraudulent Transfers Based on Novation (Count I)

52.     In his appeal to the Sixth Circuit, the Trustee argued that three independent grounds exist for invalidating the lien or security interest established under the 2002 Agreement.

53.     First, the Trustee argued that the 2004 Agreement was a novation that extinguished the 2002 Agreement and security interest granted thereunder. *Fair Finance*, 834 F.3d at 666.

54.     Second, the Trustee argued that, even absent the 2004 Agreement being a novation, if the contractual obligations incurred pursuant to the

18

2004 Agreement are avoidable as fraudulent transfers, "then the 2002 lien securing those contractual obligations becomes a legal nullity." *Id.*

55.     Third, the Trustee argued that, even absent the 2004 Agreement being a novation, the district court "may use its equitable powers to subordinate the 2002 security interest in light of Textron's post-perfection bad faith and that such subordination would effectively render Textron's [2002] lien invalid for purposes of the Ohio UFTA." *Id.*

56.     Because the Sixth Circuit reversed the judgment of the district court on the Trustee's first theory, it remanded the case "without examining the merits of the Trustee's other two arguments." *Id.* at 667.  The Sixth Circuit indicated:

> Our silence as to the two alternative theories for invalidating the 2002 security interest should in no way be taken as a comment in favor of or against the viability of such arguments going forward; specifically, our vacatur of the judgment means that the district court may, in its discretion and in light of this opinion, revisit those issues upon remand.

*Id.*

57.     Thus, to prevail on his actual fraudulent transfer claim (Count I), the Trustee must establish that the security interest established by the 2002 Agreement

(1) was extinguished by the 2004 Agreement (the Trustee's novation theory);

(2) is invalid because avoidance of the 2004 Agreement would render the 2002 security agreement a legal nullity (the Trustee's second theory); or

19

(3) can be subordinated based on Textron's post-perfection bad faith (the Trustee's third theory).

*See id.* at 666 ("[the Trustee] must show that the assets or interests in assets conveyed by the Debtor pursuant to the [2004 Agreement] were not already encumbered by a valid lien").

<u>Ohio's Version of the Uniform Fraudulent Transfer Act</u>

58.     The version of § 1336.04 of the Ohio Revised Code applicable to transfers made before March 27, 2013, provides in pertinent part:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
> > (1) With actual intent to hinder, delay, or defraud any creditor of the debtor [. . .]

Ohio Rev. Code Ann. § 1336.04 (2012).

59.     Under § 1336.04(A)(1), a plaintiff can prove fraudulent transfer by showing three elements: "(1) a conveyance or incurring of a debt; (2) made with actual intent to defraud, hinder, or delay; (3) present or future creditors." *Nat'l Credit Union Admin. Bd. v. Zovko*, No. 1:13 CV 1430, 2017 WL 4535070, at *7 (N.D. Ohio Jan. 27, 2017) (Oliver, J.) (*quoting Blood v. Nofzinger*, 2005-Ohio-3859, ¶ 36, 162 Ohio App. 3d 545, 558, 834 N.E.2d 358, 367 (Ohio Ct. App. 2005)).

60.     Under Ohio's version of the Uniform Fraudulent Transfer Act, intent

20

must be established by clear and convincing evidence.  *Blood*, 834 N.E.2d at

367-68 ("[a] creditor seeking to set aside a transfer as fraudulent has the ultimate

burden of proving, by clear and convincing evidence, the debtor's intent pursuant

to R.C. 1336.04(A)(1)").  At least this appears to be the majority view.  *Compare*

*William D. Mundinger Tr. U/A 10/13/00 v. Zellers*, 473 B.R. 222, 233-34

(N.D. Ohio 2012) (following *Blood* and requiring clear and convincing evidence);

*Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778, 793 (Bankr. S.D. Ohio

2009) (same)*; Daneman v. Stanley (In re Stanley)*, 384 B.R. 788, 799

(Bankr. S.D. Ohio 2008) (same); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*,

343 B.R. 615, 635 (Bankr. S.D. Ohio 2006) (same), *with Kovacs v. Hanson (In re*

*Hanson)*, 373 B.R. 522, 525 & n.1 (Bankr. N.D. Ohio 2007) (preponderance of the

evidence standard for fraudulent transfer actions brought under Ohio Rev. Code

§ 1336.04(A)(1); but recognizing contrary authority); *E. Sav. Bank v. Bucci*,

2008-Ohio-6363, ¶¶ 75-76 (Ohio Ct. App. 2008) ("only preponderance of the

evidence is required" to establish intent under Ohio Rev. Code § 1336.04(A)(1));

*Millstone Dev. Ltd. v. Berry* (May 9, 2002), 10th Dist. No. 01AP-907, ¶ 50 (same);

*BancOhio Nat. Bank v. Schiesswohl* (Aug. 3, 1988), 9th Dist. Nos. 13224, 13234

(regular civil burden since statutory action, which does not specify higher

standard, as opposed to purely equitable action to set aside deed due to fraud).

61.    The undersigned judge does not believe that the "clear and

convincing" standard applies to the elements of Ohio Revised Code

§ 1336.04(A)(1) other than the element of intent. For example, the decisions cited

above in *Blood*, *Grove-Merritt*, *Stanley*, and *Canyon Systems* all expressly require

that the element of intent be proved by clear and convincing evidence, but are

silent as to the burden of proof for the other elements.

62.     This intent provision of Ohio law is unlike the federal counterpart in

§ 548 of the Bankruptcy Code, where the preponderance of the evidence standard

does apply. *See Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*,

196 Fed. Appx. 337, 341 (6th Cir. 2006); *Grove-Merritt*, 406 B.R. at 794

(comparing the differing standards of proof under the Bankruptcy Code and

Ohio's adoption of the Uniform Fraudulent Transfer Act); *see also Grogan v.*

*Garner*, 498 U.S. 279, 286 (1991) (preponderance of the evidence standard is

presumed to be the standard applicable in civil actions). It should be noted that

the district court's earlier summary judgment decision involving Fortress included

an actual fraudulent claim under § 548 of the Bankruptcy Code, and thus involved

the lower preponderance of the evidence standard. Adv. Pro. 12-5101, ECF No. 8

at 113-14.

63.     Unlike Ohio's version of the Uniform Fraudulent Transfer Act, § 548

of the Bankruptcy Code can only reach back to transfers within two years before

the date of the filing of the petition. 11 U.S.C. § 548(a)(1). The Trustee has never

asserted an actual fraudulent transfer claim under § 548 against Textron. In contrast, the debtor's February 12, 2008, loan and security agreement with Fortress fell just within two years before the filing of the bankruptcy petition on February 8, 2010, thereby enabling the Trustee to bring an action against Fortress under § 548. Thus, in Count I of the second amended complaint, the Trustee instead seeks avoidance and recovery of actual fraudulent transfers from Textron under 11 U.S.C. § 544(a) and (b)(1), Ohio Rev. Code § 1336.04(A)(1), 11 U.S.C. § 550(a), and 11 U.S.C. § 551.

64.     The Sixth Circuit's decision contains extensive discussion of the Trustee's actual fraudulent transfer claim, and its legal analysis constitutes law of the case, albeit at the motion to dismiss stage of this litigation. As such, the Sixth Circuit's decision provides the appropriate framework for analyzing this portion of Textron's motion for summary judgment. The Sixth Circuit explained:

> Section 1336.04(A)(1) of the Ohio UFTA provides that "[a] transfer made or an obligation incurred by a debtor is fraudulent" and avoidable as to a creditor, "if the debtor made the transfer or incurred the obligation . . . [w]ith [the] actual intent to hinder, delay, or defraud any creditor of the debtor." The Ohio UFTA broadly defines "transfer" as "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." § 1336.01(L). And it defines "lien" to include "a security interest created by agreement." § 1336.01(H). Importantly, however, the Ohio UFTA explicitly carves out all "[p]roperty to the extent it is encumbered by a valid lien" from the statute's definition of a

23

transferable asset.  § 1336.01(B)(1).  When read in concert, these
provisions provide that, to state a claim for relief under the Ohio
UFTA, the Trustee must allege facts plausibly suggesting that the
[2004 Agreement], including its conveyance of a security interest in
all of the Debtor's property, and the payments made pursuant to the
[2004 Agreement], constitute transfers under the Ohio UFTA.  That
is, he must show that the assets or interests in assets conveyed by the
Debtor pursuant to the [2004 Agreement] were not already
encumbered by a valid lien.

*Fair Finance*, 834 F.3d at 665-66 (footnote omitted).

<u>*Actual Fraudulent Transfers Based on Novation*</u>

65.     The Sixth Circuit explained Ohio novation law as follows:

"A contract of novation is created where a previous valid obligation is
extinguished by a new valid contract, accomplished by substitution of
parties or of the undertaking, with the consent of all the parties, and
based on valid consideration."  *McGlothin v. Huffman*,
94 Ohio App. 3d 240, 244, 640 N.E.2d 598, 601 [Ohio Ct. App.
1994].  The Ohio Court of Appeals has explained that "[i]ntent,
knowledge and consent are the essential elements in determining
whether a purported novation has been accepted."  *Nat'l City Bank v.
Reat Corp.*, 64 Ohio App. 3d 212, 580 N.E.2d 1147, 1149 [Ohio Ct.
App. 1989] (alteration in original) (quoting *Bolling v. Clevepak
Corp.*, 20 Ohio App. 3d 113, 484 N.E.2d 1367, 1379 [Ohio Ct. App.
1984])).  "A party's knowledge of and consent to the terms of a
novation need not be express, but may be implied from circumstances
or conduct."  *Id.*  "[T]he evidence of such knowledge and consent,"
however, "must be clear and definite, since a novation is never
presumed."  *Bolling*, 484 N.E.2d at 1379.  These basic principles have
routinely been applied in cases involving contracts delineating
financial rights and obligations.  *See, e.g.*, *Noland v. Wilmington Sav.
Bank (In re D & K Aviation, Inc.)*, 349 B.R. 169, 175-77 (Bankr. S.D.
Ohio 2006) (noting that, where a new note has been executed between
existing parties, Ohio law provides for a presumption in favor of
finding a new loan transaction to be "a renewal of the original debt
that retains the same security" as opposed to a novation; a party may

24

overcome this presumption by demonstrating that the parties intended
for the "new loan transaction [to] discharge[ ] [the] prior debt and its
corresponding security"); *Holland v. Assocs. Fin. (In re Holland)*,
16 B.R. 83, 87 (Bankr. N.D. Ohio 1981) ("It is well settled in Ohio
that renewals of notes, or changes in the form of the evidence of a
precedent debt, do not create a new debt, or operate as a discharge or
satisfaction of the old debt, unless it is expressly agreed between the
parties.").

*Id.* at 667-68. *Accord Williams v. Ormsby*, 131 Ohio St. 3d 427, 431,

966 N.E.2d 255, 259-60 (2012):

"A contract of novation is created where a previous valid obligation is
extinguished by a new valid contract, accomplished by substitution of
parties or of the undertaking, with the consent of all the parties, and
based on valid consideration." *McGlothin*, 94 Ohio App. 3d at 244.
A novation can never be presumed but must be evinced by a clear and
definite intent on the part of all the parties to the original contract to
completely negate the original contract and enter into the second.
*King Thompson, Holzer-Wollam, Inc. v. Anderson*, [(Jan. 20, 1994)
10th Dist. No. 93APE08-1155, 1994 WL 14791, *2.]

66.    In *Fair Finance*, the Sixth Circuit then identified allegations in

support of the parties' respective positions on whether Textron and Fair Finance

clearly intended the 2004 Agreement to be a novation that extinguished the

2002 Agreement and security interest.  Allegations in support of Textron's

position included:

- the 2004 Agreement provided for a security interest in the same collateral
  that was encumbered under the 2002 Agreement;

- the 2004 Agreement reduced the total line of credit available to the Debtor;

- the language of the 2002 Agreement covered future obligations ("It is

25

Borrower's express intention that this Agreement and the continuing security interest granted hereby . . . shall extend to all future obligations of Borrower to Lenders intended as replacements or substitutions for said Obligations, whether or not such Obligations are reduced or entirely extinguished and thereafter increased or reincurred.");

- one of the recitals in the 2004 Agreement "set forth the parties' 'desire to amend and restate the Original Agreement.' "

*Id.* at 668.

67.    The Sixth Circuit next identified allegations in support of the

Trustee's position: some based on the text of the 2004 Agreement, and some based

on circumstances surrounding the execution of the 2004 Agreement.  Text-based

allegations in support of the Trustee's position included:

- Paragraph 39 expressly sets forth the parties' desire to have the [2004 Agreement] "supersede[ ] any and all prior oral or written agreements relating to the subject matter thereof." D.C. R. 66 (Redacted VanNiel Decl. Ex. 10, at 23) (Page ID #3587);

- Paragraph 35 explains that the [2004 Agreement] "constitutes the entire agreement of Borrowers and Lender relative to the subject matter hereof." *Id.* at 21 (Page ID #3585);

- in Paragraph 11, the Debtor and [Fair Holdings, Inc.] agreed to "grant, pledge, convey and assign" a new security interest in and lien upon their property to Textron "to secure the prompt and full payment and complete performance of all obligations of Borrowers to Lender under [the 2004 Agreement]." *Id.* at 6-8 (Page ID #3570-72); and

- in the conclusion to the [2004 Agreement]'s recitals, the parties explicitly confirmed that the [2004 Agreement] was the product of "valuable consideration, the receipt and sufficiency of which are hereby acknowledged." *Id.* at 1 (Page ID #3565).

26

*Fair Finance*, 834 F.3d at 668.

   68.   Other allegations in support of the Trustee's position included:

• "the parties entered into the [2004 Agreement] on the date the [2002 Agreement] matured";

• "the parties replaced the 2002 promissory note and personal guarantees with a new promissory note and new personal guarantees";

• "the [2004 Agreement] imposed significant new terms on both parties, including (1) new interest rate and fee terms; (2) an increased financial commitment on the part of Textron; (3) a requirement that the Debtor and [Fair Holdings, Inc.] deliver to Textron 50% of the amount required to obtain United's release from the [2002 Agreement] as well as 'all accrued interest, fees, expenses and other charges owed by Borrowers under the Original Agreement'; and (4) the removal of United as a lender."

*Id.* at 669.

   69.   The Sixth Circuit concluded that these allegations were sufficient to

survive Textron's Rule 12(b) motion to dismiss:

> It is true that any one of these facts, in isolation, might fail to constitute a clear manifestation of the parties' intent to have the [2004 Agreement] serve as a novation of the [2002 Agreement]. However, when examined together, in conjunction with the relevant provisions of the [2004 Agreement], and in the light most favorable to the Trustee as the nonmoving party, these facts demonstrate, at the very least, the existence of an ambiguity as to whether the parties clearly intended the [2004 Agreement] to extinguish the [2002 Agreement]. *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (explaining that, "[u]nder Ohio law, [while] interpretation of written contract terms is a matter of law for initial determination by the court," "when the relevant contract language is ambiguous . . . the job of interpretation is turned over to the fact finder"). To be sure, the ambiguity in this case is not so much over the discrete meaning of a contract term or the elements of a

27

bargained-for performance. Rather, it derives from the unique role an ostensible novation plays in setting the framework for performance. Under the circumstances here, a "new agreement" does not necessarily require the creation of a new security interest, but neither does a "new agreement" foreclose a finding of an intent on the part of the contracting parties that prior dealings have come to an end and that a new lien be created.

*Id.*

70.     Accordingly, the Sixth Circuit concluded that, "for purposes of withstanding Textron's motion to dismiss," "the Trustee has established the existence of an ambiguity as to whether the parties clearly intended the [2004 Agreement] to extinguish the [2002 Agreement] and the security interest it created." *Id.* at 669-70.

71.     In its motion for summary judgment, Textron asserts that, with discovery now complete, and after construing the evidence in a light most favorable to the Trustee, no reasonable jury court find that the 2004 Agreement extinguished the security interest granted in the 2002 Agreement.

72.     First, Textron argues that the opinion of the debtor's attorney, John Egloff, which was included as a part of the 2004 Agreement, expressly states that the 2004 Agreement does not affect the validity or priority of security interests granted in the 2002 Agreement. Case No. 5:12-CV-987, ECF No. 301, Exhibit H at 34.

73.     Second, Textron argues that the deposition testimony invariably

28

evidences an intent to continue the security interest granted in 2002. Case No. 5:12-CV-987, ECF No. 300 at 8-12, 25-26.

74.     Third, Textron asserts that the 2004 Agreement is consistent with industry custom and practice for amended and restated loan agreements that retain an existing security interest.  *Id.* at 26-30.

75.     Fourth, Textron asserts that provisions of the 2004 Agreement cited by the Sixth Circuit are boilerplate provisions found in virtually all agreements, and thus do not evidence a novation and do not preclude summary judgment in favor of Textron.  *Id*. at 30-34.

76.     In response, the Trustee argues that there is sufficient evidence for a reasonable jury to conclude that the 2004 Agreement constituted a novation that replaced the 2002 Agreement and security interest granted thereunder. Adv. Pro. 12-5101, ECF No. 234 at 15-29.  For example, the Trustee notes that even before discovery, the Sixth Circuit found "extensive evidence" in the 2004 Agreement, and in the circumstances surrounding its execution, to support the Trustee's contention that the parties "clearly and overwhelmingly manifested their intent for the [2004 Agreement] to constitute a novation of the [2002 Agreement]."  Adv. Pro. 12-5101, ECF No. 234 at 1 (quoting *Fair Finance*, 834 F.3d at 668-69).  Additionally, the Trustee asserts that the Sixth Circuit's determination regarding the ambiguity of the 2004 Agreement is law of the case.

29

Adv. Pro. 12-5101, ECF No. 234 at 15-16. Finally, the Trustee offers specific

evidence that supports his novation theory from circumstances surrounding the

2004 Agreement:

- on September 26, 2003, Textron formally advised Durham, by certified mail, that the 2002 Agreement would not be renewed;

- Textron Account Executive Mike Giulioli, in his deposition, agreed that, ultimately, Textron did enter into a whole new loan with Fair Finance;

- Ralph Infante, who signed the 2004 Agreement on behalf of Textron, in his deposition, agreed that the January 2004 security interest replaced the one that had previously existed in 2002;

- Textron obtained internal approval for the 2004 Agreement with a "credit approval form" that Textron used for new loans;

- Textron charged Fair Finance "commitment fees" for the 2002 and 2004 Agreements, but not for the ten amendments to the 2004 Agreement;

- Fair Finance issued a corporate resolution authorizing the grant of a security interest under the 2004 Agreement;

- the 2002 and 2004 Agreements were finalized at "in person" closings, unlike other amendments to the 2004 Agreement;

- Textron referred only to the 2004 Agreement when it notified other entities of its security interest; and

- contrary to established practice, the 2004 Agreement contains no express language that the 2002 lien remains in effect.

*Id*. at 16-23.

77.     In order for the Trustee to prevail on the novation theory of his actual

fraudulent transfer claim (Count I), the Trustee must prove that the security

12-05101-aih    Doc 244    FILED 02/23/18    ENTERED 02/23/18 14:06:21    Page 30 of 95

interest established by the 2002 Agreement was extinguished by the 2004 Agreement. *See Fair Finance*, 834 F.3d at 666 ("[the Trustee] must show that the assets or interests in assets conveyed by the Debtor pursuant to the [2004 Agreement] were not already encumbered by a valid lien").

78. The undersigned judge does not believe that the Trustee must establish all elements of Count I by clear and convincing evidence. As noted previously, only the intent to hinder, delay, or defraud requires a heightened burden of proof, and courts are silent as to the burden of proof for the other elements. *See William D. Mundinger Tr. U/A 10/13/00*, 473 B.R. at 233-34 (following *Blood* and requiring clear and convincing evidence); *Grove-Merritt*, 406 B.R. at 793 (same)*; Stanley*, 384 B.R. at 799 (same); *Canyon Systems*, 343 B.R. at 635 (same).

79. It is undisputed that in 2002, Fair Finance granted Textron and another lender a security interest in all of Fair Finance's present and future assets. *See* Case No. 5:12-CV-987, ECF No. 300 at 5. The Trustee has never alleged that the grant of a security interest in 2002 or any repayments or advances under the 2002 Agreement were fraudulent or avoidable. It is also undisputed that when Fair Finance granted the security interest in 2002, Fair Finance expressly agreed that the security interest shall extend to all future obligations of Fair Finance:

It is Borrower's express intention that this Agreement and the

31

continuing security interest granted hereby . . . shall extend to all
future obligations of Borrower to Lenders intended as replacements
or substitutions for said Obligations, whether or not such Obligations
are reduced or entirely extinguished and thereafter increased or
reincurred.

Case No. 5:12-CV-987, ECF No. 301, Exhibit F at 7.

80.     To prevail under his novation theory, the Trustee must do more than

show that the parties intended to create a new agreement in 2004.  The Trustee

must establish that the parties intended to extinguish the 2002 lien.  As the

Sixth Circuit explained:

Under the circumstances here, a "new agreement" does not
necessarily require the creation of a new security interest, but neither
does a "new agreement" foreclose a finding of an intent on the part of
the contracting parties that prior dealings have come to an end and
that a new lien be created.

*Fair Finance*, 834 F.3d at 669.  Therefore, it is important to acknowledge that

evidence of an intent to create a new agreement does not, by itself, create a

question of material fact for the jury.  Rather, the question is whether, when

considering the evidence in a light most favorable to the Trustee, there is sufficient

evidence for a reasonable jury to conclude that the parties intended to extinguish

the 2002 lien.

81.     In its motion for summary judgment, Textron makes a compelling

case that no reasonable jury could find that the parties intended the

2004 Agreement to extinguish the valid 2002 lien.  In particular, Textron points to

32

the Egloff opinion letter, which provides in pertinent part:

> Neither the making nor performance of the Loan Documents or the transactions contemplated thereby will adversely affect the validity or priority of the security interests granted to and obtained by Lender as a result of the making and performance of [the 2002 Agreement].

Case No. 5:12-CV-987, ECF No. 301, Exhibit H at 34.

82.     Both Textron and Fair Finance were represented by experienced counsel in connection with negotiating and drafting the 2004 Agreement.  Textron was represented by Ron Cook, who had been practicing law for 34 years as of 2004.  And as noted previously, Fair Finance was represented by John Egloff, who had been practicing law for 26 years as of 2004.  Receipt of Mr. Egloff's opinion was an explicit condition to Textron's obligation to lend under the 2004 Agreement. Case No. 5:12-CV-987, ECF No. 301 at Exhibit H - page 15.

83.     Moreover, to the extent that the Egloff opinion letter constitutes a specific provision regarding the effect of the 2004 Agreement on "the validity or priority of the security interests granted" under the 2002 Agreement, it would control over more general provisions.  *See Monsler v. Cincinnati Cas. Co.*, 74 Ohio App. 3d 321, 330, 598 N.E.2d 1203, 1209 (Ohio Ct. App. 1991) ("[a] specific provision controls over a general one."); *see also BP Chems., Inc. v. First State Ins. Co.*, 226 F.3d 420, 426-27 (6th Cir. 2000) (explaining the principle that "more specific provisions control over general ones"); *Aerel, S.R.L. v. PCC*

33

*Airfoils, LLC*, 448 F.3d 899, 903 (6th Cir. 2006) (affirming Judge Gaughan's

district court ruling that the agreement in question did contain a specific provision,

unambiguous in its terms, that expressly addressed the issue of post-termination

commissions); *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*,

525 F.3d 409, 420-21 (6th Cir. 2008) ("Well-founded principles of contract law

establish that 'specific terms and exact terms are given greater weight than general

language' and that 'separately negotiated or added terms are given greater weight

than standardized terms. . . .' Restatement (Second) of Contracts § 203 (1981).")

(giving greater weight to choice of law clause specific to this particular

agreement); *Envision Waste Servs., LLC v. City of Medina*, 2017-Ohio-351, ¶ 15,

83 N.E.3d 270, 275-76 (2017) (listing established principles of contract

interpretation under Ohio law).

      84.    On the other hand, the Egloff opinion letter is merely an exhibit

incorporated into the 2004 Agreement. Case No. 5:12-CV-987, ECF No. 301,

Exhibit H at 30. Its lack of prominence is attested to by the fact that Textron's

attorneys failed to bring this specific language to the attention of the district court

in 2012 or to the attention of the Sixth Circuit in 2016, even though distinguishing

the decision in *Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citicorp

N. Am., Inc. (In re TOUSA, Inc.)*, No. 09-60589, 2011 WL 1627129 (S.D. Fla.

Mar. 4, 2011), was a key part of the Trustee's argument on appeal. *See*

Appeal No. 15-3854, ECF No. 27 at 23-24.

85.     In holding that the Trustee's actual fraudulent transfer claim should survive Textron's Rule 12(b)(6) motion to dismiss, the Sixth Circuit distinguished the present case from *In re TOUSA*.  The Sixth Circuit explained:

> In *In re TOUSA, Inc.*, the district court concluded that the execution of a Second Amended and Restated Revolving Credit Agreement did not constitute a new obligation for the purposes of a fraudulent conveyance claim because a preexisting security agreement remained in effect. *Id*. at *7-8.  In determining that the initial security agreement still bound the plaintiff, the district court relied heavily on the Second Amended and Restated Revolving Credit Agreement's explicit statement that "it was the 'intent of the parties . . . that the security interests and [l]iens granted in the [c]ollateral under and pursuant to the [o]riginal [s]ecurity [a]greement shall continue in full force and effect.' " *Id*. at *1, *7 (alterations in original).  No such language exists in the [2004 Agreement] at issue in this case and that renders decision of the issue as a matter of law especially challenging.

*Fair Finance*, 834 F.3d at 669.  The Sixth Circuit, however, did not have the benefit of the opinion letter, incorporated into the 2004 Agreement, which provides essentially the same opinion that the underlying liens granted in the original 2002 Agreement shall continue.  While the record on appeal included the entire 2004 Agreement—along with this opinion letter as an exhibit to the agreement—no party included or cited to this language in briefing before the Sixth Circuit.  Case No. 5:12-CV-987, ECF No. 66, Exhibit 10 at 82-87.

In re Tousa, Inc. <em>Remains Instructive</em>

86.     Now that Textron has identified language in the 2004 Agreement

35

similar to that contained in the Second Amended and Restated Revolving Credit
Agreement in *TOUSA*, that decision is particularly instructive.

87.    In January of 2007, Citicorp had become a secured creditor of
TOUSA by virtue of a revolving line of credit (the "January Revolver"). *In re
TOUSA, Inc.*, 2011 WL 1627129 at *1. In July of 2007, the parties entered into a
"Second Amended and Restated Revolving Credit Agreement" (the
"July Revolver"). *Id.* After TOUSA filed for bankruptcy in 2008, an unsecured
creditors committee brought fraudulent transfer claims under federal and state law
against the secured lender, Citicorp. *Id.* at *2.

88.    The United States Bankruptcy Court for the Southern District of
Florida granted Citicorp's motion to dismiss the claims based on the July Revolver
and later amendments, except as to any new collateral pledged after the
January Revolver:

> I do not accept the proposition that in respect of existing
> collateral, which came into effect prior to . . . July 2007, that a new
> lien was created by virtue of the entry of the parties into a new
> lending agreement, be it in July, October, or December.

> The preexisting liens, which were granted in the October 2006
> [R]evolver, as amended in January 2007, carried forward, and to the
> extent that the collateral that was granted under those prior
> agreements carried forward under the July amendments, I find that
> there was no new transfer that's subject to avoidance as a fraudulent
> transfer under [11 U.S.C. § 548.

> . . . . [I]t's clear to me . . . that the lending terms, including

36

default and repayment provisions, were modified in the three agreements starting in July 2007, but to the extent that the collateral that had been posted for the prior revolver remained the same, that flows through and is, in my view, immune from attack under [§] 548 as set forth in the [C]ommittee's complaint.

[D.E. 2-34 at 142-45].

*Id.* at *3-4 (quoting from bankruptcy court's bench ruling).

89.     On appeal, U.S. District Judge (now U.S. Circuit Judge) Jordan

affirmed.  Judge Jordan reasoned:

As noted earlier, the July Revolver stated that it was the "intent of the parties . . . that the security agreements and [l]iens granted in the [s]ecurity [a]greement shall continue in full force and effect." Similarly, under the July Revolver, the parties kept all rights and obligations incurred from the January Revolver.  Thus, notwithstanding the general language in the July Revolver that all prior agreements were being restated in their entirety, obligations already incurred were not voided, extinguished, or superseded, and the Committee's argument therefore fails.

. . . .

Nor can the Committee escape this conclusion by arguing, as it does, that the post-July 31 liens are the liens it is attempting to set aside. Nothing was transferred on July 31, 2007, or afterwards.  *The fact that Citicorp filed new financing statements on already-perfected liens does nothing to change the analysis.*  The only way the Committee's argument can logically work is if the July Revolver wiped all of the previous liens. In that situation, a bona fide purchaser could theoretically acquire a superior interest over Citicorp's interest in the small window between cancellation of the previous liens and perfection of the new liens.  But this, again, logically boils down to the argument that the July Revolver cancelled all existing liens, an argument that I have already rejected.  The July Revolver explicitly states the already-existing liens carried forward.  The bankruptcy

37

court, therefore, did not err in its judgment.

*Id.* at *7-8.

90.     Nothing in the Sixth Circuit's decision disputes the reasoning in *TOUSA*, other than to distinguish the current case based on the absence of language in the 2004 Agreement explicitly stating that it was the parties' intent that the liens granted under the original security agreement shall continue in full force and effect.

91.     Textron also asserts that the deposition testimony of individuals involved in negotiating the 2004 Agreement lends further support for the position taken in the Egloff letter that the 2004 Agreement was never intended to affect the validity of the lien granted in the 2002 Agreement.  Case No. 5:12-CV-987, ECF No. 300 at 9-12, 25-26.

92.     For example, Cook testified that the 2004 Agreement did not extinguish and grant anew a security interest. Case No. 5:12-CV-987, ECF No. 301, Exhibit X at 159 (Cook Dep.).  Cook testified that he had discussed the debtor's opinion with Egloff, and that, based on that opinion, it was mutually understood that "there was nothing in [the 2004 Agreement] that affected the security interest that had been granted in the 2002 Agreement."  *Id.* at 159-60 (testifying that he had not been satisfied with the original draft of the Debtor's Opinion, which did not contain this language, and that the final opinion confirmed

38

that the 2002 security interest "still remained in effect."). In addition, both Cook and Egloff testified that the request for and giving of opinions like the debtor's opinion, and its assurance of a continuous security interest, is standard practice. *Id.* at 162-63; Case No. 5:12-CV-987, ECF No. 301, Exhibit W at 113-14 (Egloff Dep.).

93. Textron also notes that Ralph Infante, who signed the Restatement on behalf of the Textron, testified that the security interest "[a]bsolutely" continued from 2002 through 2007, and that "it's the understanding how we do business, that we always . . . carry the security from one to the other by amending and restating the current document to cover that." Case No. 5:12-CV-987, ECF No. 301, Exhibit Z at 332-33 (Infante Dep.). Infante also testified that the purpose of the 2004 Agreement was simply to "restructure the existing document," and that it was "just a renewal." *Id.* at 41, 173. When asked about the Egloff opinion, Infante testified that he believed it explained "the liens from the original agreement have been carried forward, they will remain in place." *Id.* at 295.

94. On the other hand, Infante also agreed at his deposition that "the January 2004 security interest replaced the one that had previously existed in 2002." *Id*.

95. As noted earlier, the Trustee asserts that the Sixth Circuit has already determined that there are sufficient facts for a reasonable jury to conclude that the

39

parties intended to extinguish the 2002 lien. *See* Adv. Pro. 12-5101, ECF No. 234 at 1. For example, the Trustee notes that, at the motion to dismiss stage, the Sixth Circuit indicated the existence of "extensive evidence" that supports the Trustee's contention that there was a novation. *Id.*

96.     In its opinion, the Sixth Circuit said:

> there remains extensive evidence that went unexamined by the district court, evidence that supports the Trustee's contention that the parties clearly and overwhelmingly manifested their intent for the 2004 ARL&SA to constitute a novation of the 2002 L&SA, making it inappropriate to determine the parties' intent at the motion to dismiss stage.

*Fair Finance*, 834 F.3d at 668.

97.     In addition, the Trustee asserts that the Sixth Circuit's finding of ambiguity, *see* 884 F.3d at 688 n.12, is law of the case. Adv. Pro. 12-5101, ECF No. 234 at 15-16. This would enable other evidence to come in interpreting the contract, such as custom and practice of parties and the industry in general.

98.     Generally, a decision on a motion to dismiss does not establish the law of the case for purposes of summary judgment. *See McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) (a decision "on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery"); *see also* 5 Wright & Miller, Federal Practice & Procedure, § 1387 ("A party who challenges the face of the pleading for insufficiency in stating a claim for relief ought not to forfeit the

40

right to attack the merits of an opponent's case as not being trial worthy on the basis of affidavits and other supporting material.").

99.    In the present case, the Sixth Circuit had the benefit of the 2004 Agreement and other documents, which were included in briefing before the district court and the Sixth Circuit. *Fair Finance*, 834 F.3d at 656-57 n.1.  The Sixth Circuit noted that consideration of this evidence did not convert the motion to dismiss into one for summary judgment under Rule 12(c) made applicable under Bankruptcy Rule 7012. *Id.*

100.    Nevertheless, the Sixth Circuit's decision contains language, perhaps merely dicta but still directed to the parties and the district court, that seems to provide more than just a decision as to the plausibility of allegations in the complaint for purposes of a Rule 12(b)(6) motion to dismiss.  Examples include:

- "genuine factual disputes surround the issue of the effect of the [2004 Agreement] on the continuing validity of the security interest conveyed under the [2002 Agreement]"; 834 F.3d at 667;

- "there remains extensive evidence that went unexamined"; *id.* at 668;

- these provisions [of the 2004 Agreement] support a finding that the parties demonstrated their intent to "extinguish[ ] their obligations under the prior agreement" and be bound anew under the terms of the [2004 Agreement]"; *id.*;

- "we find additional evidence of the parties' intent to have the [2004 Agreement operate as a novation of the [2002 Agreement]"; *id.* at 669; and

41

- "when examined together . . . and in the light most favorable to the Trustee as the nonmoving party, these facts demonstrate, at the very least, the existence of an ambiguity as to whether the parties clearly intended the [2004 Agreement to extinguish the [2002 Agreement]"; *id.*

Such language is understandable given that the Sixth Circuit considered documents accompanying the parties' briefing on Textron's 2012 motion to dismiss. 834 F.3d at 656-57 n.1.

101. As noted earlier, Textron makes a compelling case that no reasonable jury could find that the parties intended the 2004 Agreement to extinguish the valid 2002 lien. The opinion letter, incorporated into the 2004 Agreement, contains language almost as explicit as the language in the "Second Amended and Restated Revolving Credit Agreement" in *TOUSA*, which shows that it was the parties' intent that the liens granted under the original security agreement shall continue in full force and effect. *Compare* Case No. 5:12-CV-987, ECF No. 301, Exhibit H at 34 ("Neither the making nor performance of the [2004 Agreement] will adversely affect the validity or priority of the security interests granted to and obtained by Lender as a result of the . . . [the 2002 Agreement]"), *with In re TOUSA, Inc.*, 2011 WL 1627129 at *1, *7 ("it was the 'intent of the parties . . . that the security interests and [l]iens granted in the [c]ollateral under and pursuant to the [o]riginal [s]ecurity [a]greement shall continue in full force and effect.' ") (alterations in original). Nor was a release of the lien ever filed until the debtor

42

and Textron ended their relationship in 2007.

102.   Indeed, were it not for language in the Sixth Circuit's decision, the undersigned judge would likely recommend that the district court grant Textron's motion for summary judgment with respect to the Trustee's theory for actual fraudulent transfer based on novation.

103.   Furthermore, were this bankruptcy court writing on a clean slate, it would likely recommend granting summary judgment in favor of Textron with respect to this issue without having to look beyond the simple fact that Textron never filed a release of its 2002 lien until 2007.

104.   As the Delaware Supreme Court held in a case involving the purportedly inadvertent filing of a UCC-3 termination statement, which turned a $1.5 billion secured loan into an unsecured loan:

> [O]ne of the most important roles the UCC plays is facilitating the efficient procession of commerce by permitting parties to rely in good faith on the plain terms of authorized public filings. The UCC thus enables the crafting of contractual arrangements that generate wealth and the investment of capital in commercial enterprise because parties are able to rely on a clear and predicable set of rules to govern their transactions.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1016-17 (Del. 2014) (footnotes omitted).

105.   Just as the parties were able to rely on the filing of a termination statement with respect to a secured loan to General Motors, so too should Textron

43

and other parties be able to rely on the absence of a termination statement being filed with respect to the 2002 lien involving Fair Finance until the borrower/lender relationship ended in 2007. Nevertheless, the bankruptcy court acknowledges that it is not writing on a clean slate and is in fact bound by the analysis of the Sixth Circuit in *Fair Finance.*

106.   The language in the Sixth Circuit's decision cannot be ignored. When the Sixth Circuit refers to documents incorporated in the Trustee's first amended complaint and indicates that there is "extensive evidence" that supports the Trustee's contention that the parties intended to "replace and extinguish" the 2002 Agreement, the lower court must exercise care before choosing to disregard such language. True, the Sixth Circuit's statement was in the context of a Rule 12(b)(6) motion to dismiss. But the "extensive evidence" did not go away. Rather, Textron has simply brought to the court's attention other evidence that the parties never intended the 2004 Agreement to extinguish the valid 2002 lien. Whether this other evidence proves to be more persuasive than the "extensive evidence" identified by the Sixth Circuit is ultimately a question for the jury. *See Anderson v. Liberty Lobby*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

107.   Accordingly, the undersigned judge recommends that the district

44

court deny Textron's motion for summary judgment with respect to the Trustee's theory for actual fraudulent transfer based on novation.

## B. The Trustee's Two Other Theories for Actual Fraudulent Transfers Not Based on Novation

108.   In its decision, the Sixth Circuit acknowledged that the Trustee's actual fraudulent transfer claim encompassed two other theories for invalidating Textron's 2002 security interest besides the Trustee's primary argument that the security interest was extinguished through a novation in 2004:

> Next, the Trustee argues that, if this Court turns first to the contractual obligations incurred pursuant to the [2004 Agreement] and finds them avoidable as incurred for the purpose of defrauding the Debtor's creditors, then the 2002 lien securing those contractual obligations becomes a legal nullity.  Finally, the Trustee asserts that this Court may use its equitable powers to subordinate the 2002 security interest in light of Textron's post-perfection bad faith and that such subordination would effectively render Textron's lien invalid for purposes of the Ohio UFTA.

*Fair Finance*, 834 F.3d at 666.  The Sixth Circuit then clarified that it was remanding the case "without examining the merits of the Trustee's other two arguments," and that "the district court may, in its discretion and in light of this opinion, revisit those issues upon remand."  *Id.* at 667.

109.   As explained more fully below, the undersigned judge recommends that the district court grant summary judgment in favor of Textron with respect to these two other arguments.

45

110.    The Trustee's first alternative argument is that, even if there was no novation, he can still avoid the 2004 Agreement as a fraudulently incurred obligation.  This theory has received only minimal briefing to date. Adv. Pro. 12-5101, ECF No. 234 at 29-31; Case No. 5:12-CV-987, ECF No. 314 at 10-12.

111.    Nevertheless, to the extent the Trustee is attempting to argue that, even absent a novation, avoidance of the 2004 Agreement would render the 2002 lien a legal nullity, this argument is without merit.  This is because the 2002 Agreement expressly and unambiguously provides for the lien to continue to apply to future advances:

> It is Borrower's express intention that this Agreement and the continuing security interest granted hereby . . . shall extend to all future obligations of Borrower to Lenders intended as replacements or substitutions for said Obligations, whether or not such Obligations are reduced or entirely extinguished and thereafter increased or reincurred.

Case No. 5:12-CV-987, ECF No. 301, Exhibit F at 7.  And, absent a novation in 2004 that extinguished the 2002 lien, the 2002 lien does not become a legal nullity, but instead continues to apply to future advances.

112.    The Trustee's other alternative argument is that the district court can use its equitable powers to subordinate the 2002 security interest in light of Textron's post-perfection bad faith and that such subordination would effectively

46

render Textron's lien invalid for purposes of the Ohio Uniform Fraudulent

Transfer Act. *Fair Finance*, 834 F.3d at 666.

113.    The district court previously rejected the Trustee's argument that

Textron's alleged bad faith could invalidate its previously perfected lien:

> [T]o the extent that the Trustee is arguing that Textron's "lack of good
> faith" renders the 2002 security interest "invalid," the Court rejects the
> argument.  While the Trustee may be correct that the Court could
> subordinate claims in a preference action, this Court rejects the Trustee's
> suggestion that the bad faith of a secured party renders the lien itself invalid.
> Ohio law defines "valid lien" as a "lien that is effective against the holder of
> a judicial lien subsequently obtained by legal or equitable process or
> proceedings."  The Trustee provides the Court with no case in which a
> perfected security interest was deemed "invalid" under Ohio law as a result
> of the alleged bad faith of the lender, where the bad faith allegedly arose
> long after the perfection of the security interest.  Rather, the case law cited
> by Textron demonstrates that "bad faith" does not invalidate the lien for
> purposes of fraudulent transfer claims.  *See Melamed v. Lake Cnty. Nat'l
> Bank*, 727 F.2d 1399 [(6th Cir. 1984)] (although not discussing it directly,
> finding that transfers made pursuant to a valid security interest in accounts
> receivable could not form the basis of a fraudulent transfer claim even in the
> face of misconduct on the part of the lender).

*Bash v. Textron Financial*, 483 B.R. at 648-49.

114.    Nothing in the Sixth Circuit's decision or in the Trustee's current

briefing, *see Fair Finance*, 834 F.3d at 664, 667; Adv. Pro. 12-5101, ECF No. 234

at 31-34, provides a reason for the district court to change its prior determination

that subsequent bad faith cannot invalidate a perfected security interest under Ohio

law.

115.    Ohio's version of the Uniform Fraudulent Transfer Act expressly

47

excludes from the definition of "asset" "property to the extent it is encumbered by a valid lien." Ohio Rev. Code Ann. § 1336.01(B). " 'Valid lien' means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." Ohio Rev. Code Ann. § 1336.01(M).

116. Under a plain reading of these provisions, the expression "effective against the holder of a judicial lien subsequently obtained . . ." refers to whether the lien has been properly perfected. The Trustee has cited no case law interpreting Ohio's version of the Uniform Fraudulent Transfer Act that interprets this definition in a manner that would allow a lien, valid at the time of perfection, to be invalidated as a result of bad faith or some other misconduct at some later period of time.

117. This plain reading of Ohio Revised Code § 1336.01 is also consistent with Comment 2 of the Uniform Fraudulent Transfer Act (1984), which provides in pertinent part:

> Subparagraphs (i), (ii), and (iii) [of the definition of "asset"] provide clarification by excluding from the term not only generally exempt property but also an interest in a tenancy by the entirety in many states and an interest that is generally beyond reach by unsecured creditors because subject to a valid lien. This Act, like its predecessor and the Statute of 13 Elizabeth, declares rights and provides remedies for unsecured creditors against transfers that impede them in the collection of their claims. The laws protecting valid liens against impairment by levying creditors, exemption statutes, and the rules restricting levyability of interest in entireties property are limitations on the rights and remedies of unsecured

48

creditors, and it is therefore appropriate to exclude property interests that are beyond the reach of unsecured creditors from the definition of "asset" for the purposes of this Act.

Definitions, Uniform Fraudulent Transfer Act § 1.

118.   Accordingly, the undersigned judge recommends that the district court grant Textron's motion for summary judgment with respect to the Trustee's two theories for actual fraudulent transfers not based on novation.

### *C. The Trustee's Civil Conspiracy Claim - Count II*

119.   Unlike in its earlier motion to dismiss, Textron is not asserting in its current summary judgment motion that the record fails to establish the elements of a civil conspiracy under Ohio law.  Rather, Textron asserts two independent, affirmative defenses for establishing summary judgment in its favor on the Trustee's claim of civil conspiracy: (1) the debtor's express release of Textron from all causes of action in 2007; and (2) the doctrine of *in pari delicto*.

120.   As explained more fully below, the undersigned judge recommends that the district court grant summary judgment in favor of Textron on the Trustee's civil conspiracy claim based on the defense of *in pari delicto*.  Because the *in pari delicto* defense is dispositive, fully-developed, and straightforward, the district court need not decide or even address Textron's alternative defense of release, which has had only minimal briefing and is problematic.

121.   The undersigned judge will address the *in pari delicto* defense first.

49

## *In Pari Delicto*

122. The Sixth Circuit's decision contains extensive discussion of the affirmative defense of *in pari delicto*, and its legal analysis constitutes law of the case. As such, the Sixth Circuit's decision provides an appropriate framework for analyzing this portion of Textron's motion for summary judgment.

123. In addressing the Trustee's civil conspiracy claim, the Sixth Circuit first rejected Textron's argument that the Trustee lacked standing to bring such a claim. The Sixth Circuit emphasized that the Trustee does have standing to bring a civil conspiracy claim alleging injury to the debtor, as opposed to injury suffered by the debtor's investors. *Fair Finance*, 834 F.3d at 675-76.

124. Next, the Sixth Circuit discussed the *in pari delicto* defense.

> As Textron asserted and the district court concluded, the Trustee's civil conspiracy claim is likely barred by the common law *in pari delicto* defense, which "derives from the Latin, *in pari delicto potior est conditio defendentis*," meaning "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S. Ct. 2622, [2626 (1985)] (alterations in original) (quoting Black's Law Dictionary 711 (5th ed. 1979)). This equitable defense is used to bar a plaintiff's recovery when the plaintiff "bears at least substantially equal responsibility for the underlying illegality" upon which the claim is based, *Pinter v. Dahl*, 486 U.S. 622, 635-36, 108 S. Ct. 2063, [2072 (1988)], in light of "the policy that 'no Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act[.]' " *Downie-Gombach v. Laurie*, 41 N.E.3d 858, 865 (Ohio Ct. App. 2015) (quoting *In re Dow*, 132 B.R. 853, 860 (Bankr. S.D. Ohio 1991)). The *in pari delicto* defense has repeatedly been used to bar the actions of "bankruptcy trustee[s] against third parties

50

who participated in or facilitated wrongful conduct of the debtor[s]."
*Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1276
(10th Cir. 2008) (collecting cases).

*Id.* at 676.

125.   The Sixth Circuit then noted that the Trustee "stands in the shoes of

the Debtor and that the *in pari delicto* defense may be raised against a bankruptcy

trustee to the same extent it could have been raised against a debtor prior to the

filing of bankruptcy." *Id*.  Thus, whether the defense may be raised against the

Trustee depends on whether the fraudulent conduct of the debtor's officers and

directors should be imputed to the debtor.  *Id*.

126.   The Sixth Circuit next explained that, under Ohio law, "[a] principal

is generally charged with the knowledge of and conduct undertaken by its agent

operating within the scope of his employment."  *Id*. (citing *First Nat'l Bank of*

*New Bremen v. Burns*, 88 Ohio St. 434, 438 103 N.E. 93, 94 (1913)).

127.   "Such knowledge and conduct, however, will not be imputed to a

principal if its agent is engaged in committing an independent fraudulent act on

his own account, and the facts to be imputed relate to this fraudulent act. . . . This

principle is known as the adverse interest exception."  *Id*. at 676-77 (internal

quotations and citations omitted).

128.   The Sixth Circuit then noted:

The adverse interest exception is not absolute, however.  Pursuant to

51

the sole actor doctrine, if the agents responsible for the adverse
conduct are the officers or directors of the principal and those officers
or directors "so dominated and controlled the [principal] that the
[principal] had no separate mind, will, or existence of its own," then
the officers and directors are deemed the "alter egos" of the principal
and "any malfeasance on their parts is directly attributable to the
[principal]." *[Terlecky v. Hurd (In re Dublin Sec.)]*, 133 F.3d 377,
380 (6th Cir. 1997).

*Id.* at 677.

129.   The Sixth Circuit explained:

"The innocent insider exception is a corollary to the sole actor
rule. . . . The touchstone of the innocent insider exception is control.
If an innocent person inside the corporation had the power to stop the
fraud, the agent and the company are not mere alter egos, so the sole
actor rule cannot apply." *Unencumbered Assets, Tr. v. Great Am. Ins.
Co.*, 817 F. Supp. 2d 1014, 1036 (S.D. Ohio 2011) (quoting
*McHale v. Citibank, N.A.* (*In re 1031 Tax Grp., LLC*), 420 B.R. 178,
202 (Bankr. S.D.N.Y. 2009));

*Id.* at 677.

130.   The Sixth Circuit then ventured its "*Erie* guess" that the Ohio

Supreme Court would adopt the innocent insider exception to the sole actor

doctrine:

[W]e conclude that the Ohio Supreme Court would adopt the innocent
insider exception to the sole actor doctrine.  Ohio has long followed
the sole actor doctrine. *See First Nat'l Bank of New Bremen*,
103 N.E. at 96. Although no Ohio court appears to have decided
whether to apply the innocent insider exception to that doctrine, *see
Unencumbered Assets, Tr.* [817 F. Supp. 2d at 1036], the innocent
insider exception is a corollary that flows ineluctably from the agency
principles that underlie the sole actor doctrine.

52

The United States District Court for the Southern District of New York has described why this is the case. The adverse interest exception to the *in pari delicto* doctrine applies "the fiction of imputation" by asking "whether the knowledge of the agent that is to be imputed to the principal was gained within, or outside of, the scope of agency." *[Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co.)]*, 311 B.R. 350, 373 (S.D.N.Y. 2004), *aff'd in part and rev'd in part*, 529 F.3d 432 (2d Cir. 2008). "Even when an agent is defrauding his principal, unless the agent has totally abandoned the interests of the principal and is acting entirely in his own, or another person's, interest, that agent is acting within the scope of his agency." *Id*. The sole actor doctrine is based on the recognition that, when a particular agent or set of agents "are one and the same" as the principal, "it would be nonsensical to refrain from imputing the agent's acts of fraud to the corporation, despite the agent's total abandonment of the corporation's interests, because the agent is identical to the corporation." *Id*. (internal quotation marks omitted). But, "when the innocent insiders possessed authority to stop the fraud, the 'sole actor rule' does not apply, because the culpable agents who had totally abandoned the interests of the principal, and were thus acting outside the scope of their agency, were not identical to the principal." *Id*. In other words, a set of agents cannot be said to be the sole actor who is one and the same as the principal when others exist within the principal who had sufficient authority to stop the fraud had they known of it. Accordingly, we hold that the Ohio Supreme Court, if given the chance, would apply the innocent insider exception to the sole actor doctrine.

*Id.* at 678-79.

131. When the evidence is viewed in a light most favorable to the

nonmoving party—the Trustee—there can be no doubt that Durham and Cochran

dominated the debtor. As the Sixth Circuit noted in its opinion:

On appeal, the Trustee does not take issue with the district court's conclusion that Durham and Cochran dominated the Debtor. Appellant's Opening Br. 43. Rather, the Trustee reiterates that, "even

53

if the 'sole actor' doctrine might otherwise apply here, it is subject to the 'innocent insider' exception, which exists if the company had at least one innocent decision-maker who could have stopped the wrongdoing if he or she had known of it." *Id.*

*Id.* at 677.

132.   In its brief, Textron notes that the Trustee himself has testified that Fair Finance was a party to the alleged conspiracy.  Case No. 5:12-CV-987, ECF No. 314 at 15; *see also* Case No. 5:12-CV-987, ECF No. 301, Exhibit DD at 11.  And while this statement does not constitute a judicial admission, *see MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997)), the record in this case is replete with statements by the Trustee and his attorneys acknowledging Durham and Cochran's complete domination of the debtor.  *See Bash v. Textron Financial*, 483 B.R. at 651 ("[T]he Trustee acknowledges that the 'complaint avers that Durham controlled all aspects of the Debtor's operations.'" (quoting Plaintiff's brief)); *Fair Finance*, 834 F.3d at 677 ("[T]he Trustee does not take issue with the district court's conclusion that Durham and Cochran dominated the Debtor.")

133.   Rather, the Trustee's sole argument before the Sixth Circuit to avoid application of the *in pari delicto* defense was the assertion that an innocent person inside the corporation had the power to stop the fraud and that the Trustee was under no duty to plead facts in his complaint necessary to defeat an affirmative

54

defense. Appeal No. 15-3854, ECF No. 23 at 43-46.

134. In his opposition brief, the Trustee insists that questions of fact remain as to whether Durham and Cochran were "sole actors" within the meaning of Ohio law when they committed their fraud and treated the debtor as their personal piggy bank. *See* Adv. Pro. 12-5101, ECF No. 234 at 39-40. For example, the Trustee notes that Fair Finance was a successful business with legitimate owners for nearly seventy years before it was acquired by Durham and Cochran. *Id*. at 39.

135. This argument is without merit. Now that discovery has been completed, the Trustee concedes that Durham and Cochran dominated the company they owned and controlled such that no innocent person inside the corporation had the power to stop the fraud. *See* Adv. Pro. 12-5101, ECF No. 199 at 1. Nothing further is required. *Accord In re Derivium Capital LLC*, 716 F.3d 355, 368 (4th Cir. 2013) (noting that "the sole actor rule is a well-established principle of agency law" and that the "rationale underpinning this rule is that 'the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability.' " (quoting *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 359 (3d Cir. 2001))); *Unencumbered Assets Tr.*, 817 F. Supp. 2d at 1034-37 (applying Ohio law and

55

holding at the summary judgment phase that adverse interest exception is overcome by sole actor rule and that the fraudulent conduct of the debtor's principals must be attributed to the debtor and rejecting the plaintiff's innocent insider argument).

136.    Rather, the Trustee is left with a thin reed of an argument.  Relying on the Sixth Circuit's citation to an unreported decision from an intermediate state appellate court in Michigan, the Trustee maintains that the presence of an innocent decision maker outside the corporation in the form of a state regulator might suffice to avoid application of the sole actor doctrine under Ohio law.  This argument is a bridge too far.

137.    In his briefing before the Sixth Circuit, the Trustee never asserted that the "innocent insider" exception extended to regulators outside the corporation. Rather, the Trustee argued on appeal that the Rule 12(b)(6) record revealed "at least nine officer-level Fair Finance employees who may not have been complicit in Durham and Cochran's scheme."  Appeal No. 15-3854, ECF No. 23 at 43-45 and ECF No. 31 at 19-20.

138.    In its decision, the Sixth Circuit cited *Midwest Mem'l Grp. LLC v. Citigroup Global Mkts. Inc.*, No. 322338, 2015 WL 5519398 (Mich. Ct. App. Sept. 17, 2015), an unpublished decision from the Michigan Court of Appeals, among a string of six cases acknowledging the innocent insider exception as a

corollary to the sole actor rule. In citing *Midwest Memorial*, the Sixth Circuit included the following parenthetical:

> ("For the existence of an innocent decision-maker to preclude application of the sole actor rule, there must exist[ ] at least one innocent decision maker who, if he had been alerted to the fraud, could have stopped it." (alteration in original) (internal citation and quotation marks omitted)).

*Fair Finance*, 834 F.3d at 677.

139. Now that the Trustee has conceded that there were no "innocent insiders" within Fair Finance, the Trustee asserts that the district court should apply the expansive definition of "innocent decision maker" contained in the majority opinion in *Midwest Memorial*, something not addressed by the Sixth Circuit's decision or in any briefing before the Sixth Circuit.

140. *Midwest Memorial* involved the application of Michigan law, and the majority opinion in *Midwest Memorial* emphasized the *sui generis* nature of its holding that the cemetery commissioner could constitute an innocent decision maker: "On the unique fact of this case, we find the sole actor rule inapplicable given the cemetery commissioner's statutory authority and obligation to act for the protection of the cemeteries and the interests of the public." *Midwest Mem'l Grp. LLC*, 2015 WL 5519398 at *11 (footnote omitted).

141. In his dissenting opinion, Judge O'Connell acknowledged the concept of an innocent decision maker as an exception to the sole actor exception. But he

57

took issue with the majority expanding the exception beyond persons making

decisions as part of the corporation:

> Here, Smart was the sole shareholder of Summerfield.  Under those auspices, Smart looted Summerfield of its assets. The sole actor rule is precisely on point.  However, plaintiffs attempt to squeak past the sole actor rule by relying on the "innocent decision maker exception," an exception to the exception to the exception to the wrongful conduct rule.

> . . . .

> Even if [the innocent decision maker] exception was applicable, it only applies in cases where the innocent decision maker makes decisions as part of the corporation.  In [*In re Sharp Int'l Corp.*, 278 B.R. 28 (Bankr. E.D.N.Y. 2002)], the "innocent decision maker" was a 13% shareholder who regularly visited the offices, consulted with the corporation, and received and reviewed financial statements.  *Sharp*, 278 B.R. at 37.  The innocent decision maker did not have a controlling share, but was part of the decision making process.  The Court relied on the fact that the shareholder reviewed financial statements and could have stopped the fraud while it was occurring. *See id.* at 39 (stating that the shareholder could have ended the fraudulent activity).

> There is no evidence that this is the case here.  In this case, neither Paskin, nor Funk, nor the cemetery commissioner held shares in Summerfield or exercised any level of control over the corporation at the time of the fraudulent investment decisions.  The majority recognizes that there is no evidence that, while innocent, any of these parties were decision makers.  I cannot conclude that the innocent decision maker exception applies, even presuming it is the law in Michigan.

*Id*. at *16.

142.   The majority opinion's expansive definition of innocent decision

58

maker in *Midwest Memorial* would also be inconsistent with the principal and agent relationship recognized by the Ohio Supreme Court in its 1913 decision in *First Nat'l Bank of New Bremen* and followed by the Sixth Circuit in *Fair Finance*. As explained by the Ohio Supreme Court, the test is essentially whether the principal and agent are alter egos. When an agent is the alter ego of the principal, "his acts and knowledge *ipso facto* become the knowledge and acts of the principal." *First Nat'l Bank of New Bremen*, 103 N.E. at 95. *Accord Fair Finance*, 834 F.3d at 676 (following *First Nat'l Bank of New Bremen*).

143. Under the Trustee's expansive definition, even if a corporation were completely dominated by a corrupt, sole owner, such that the corporation and its owner were alter egos, a bankruptcy trustee or other successor in interest could successfully avoid an *in pari delicto* defense so long as some regulator outside the corporation was in a position to take action against the improper activity. This interpretation would swallow up the sole actor doctrine.

144. The Trustee's interpretation would also seemingly run counter to language in the Sixth Circuit's decision that "innocent insider" necessarily means someone *inside* the corporation:

> [A] set of agents cannot be said to be the sole actor who is one and the same as the principal when others exist *within the principal* who had sufficient authority to stop the fraud had they known of it.

*Id.* at 679 (emphasis added).

59

145.    As the Sixth Circuit acknowledged in 2016, "the Trustee's civil

conspiracy claim is likely barred by the common law *in pari delicto* defense."

834 F.3d at 676.  Now that discovery is complete, that acknowledgment can be

confirmed.  Accordingly, because the Trustee has conceded that there was no

innocent person inside Fair Finance who had the power to stop the fraud, the

undersigned judge recommends that the district court grant summary judgment in

favor of Textron on the Trustee's civil conspiracy claim—Count II of the second

amended complaint—as barred by the affirmative defense of *in pari delicto*.

<u>Release</u>

146.    In contrast with the defense of *in pari delicto*, which Textron first

raised shortly after this action was filed in 2012 and which has been the subject of

extensive briefing before the bankruptcy court, the district court, and the

Sixth Circuit, the affirmative defense of release was never raised until Textron

filed its motion for summary judgment on November 3, 2017.

147.    Textron asserts that the broad release that the debtor signed in 2007

constitutes a complete defense to the Trustee's civil conspiracy claim.  In

response, the Trustee asserts that Textron has waived the affirmative defense of

release by failing to raise this affirmative defense in Textron's answer to the

Trustee's second amended complaint.  The Trustee also asserts that the release

itself may be invalid or constitute a voidable transfer.

60

148.   It is undisputed that when Textron and the debtor agreed to sever their lender/borrower relationship in 2007, the debtor signed a release stating that it "forever releases and discharges" Textron from "any and all claims, suits or causes of action [the debtor] may have against [Textron] . . . arising out of the [2004 Agreement]."  Case No. 5:12-CV-987, ECF No. 301, Exhibit I at 4.

149.   The Trustee's civil conspiracy claim arises out of the 2004 Agreement because it is premised entirely on the lending relationship between Textron and the debtor.  *See Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1310-11 (5th Cir. 1983) (release of claims "arising out of" certain agreements barred antitrust conspiracy claim); *Solits v. J.C. Penney Corp.*, 635 Fed. App'x 245, 248 (6th Cir. 2015) (noting the "expansive language" of a release using the terms "any and all claims" and "arising out of"); *Mackey v. Judy's Foods, Inc.*, 654 F. Supp. 1465, 1468, 1472-73 (M.D. Tenn. 1987) (release from "all claims . . . arising out of any agreement with [Defendant]" barred tort claims).

150.   The Trustee, in bringing his conspiracy claim, is bringing it in the "shoes of the debtor," and only "has standing to bring any action that the [debtor] could have brought had [the debtor] not filed a petition for bankruptcy." *Fair Finance*, 834 F.3d at 675 (quoting *Cannon v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 853 (6th Cir. 2002)).  Because the debtor released any such

61

conspiracy claim against Textron in 2007, it follows that the Trustee cannot assert the claim in this proceeding, provided the affirmative defense has not been waived and the release itself is valid.

151.   Under Rule 8(c) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 7008, release is an affirmative defense.  "As a general rule, failure to plead an affirmative defense results in [forfeiture] of that defense."  *Old Line Life Ins. Co. of Am. v. Garcia*, 418 F.3d 546, 550 (6th Cir. 2005).  However, failure to plead an affirmative defense does not always result in waiver.  *See Rogers v. IRS*, 822 F.3d 854, 856 (6th Cir. 2016); *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993).

152.   In *Rogers*, the Sixth Circuit held that a defendant may raise an affirmative defense for the first time in a motion for summary judgment if doing so does not result in surprise or prejudice to the plaintiff."  822 F.3d at 856.

153.   In *Sushka*, the Sixth Circuit held that failure to raise an affirmative defense before a second motion for summary judgment was not fatal.  The Sixth Circuit explained:

> The purpose of Rule 8(c) of the Federal Rules of Civil Procedure is to give the opposing party notice of the affirmative defense and a chance to respond.  *Ibid*.  While we agree that Sushka should have been more diligent in raising these defenses, we do not believe that the district court abused its discretion by permitting them to be raised in the

62

second motion for summary judgment.  Sushka's failure to raise
either affirmative defense did not result in surprise or unfair prejudice
to Smith, especially since the district court extended the trial date in
order to give Smith the opportunity to fully respond to and brief the
issues.

117 F.3d at 969.  *Accord Huss v. King Co.*, 338 F.3d 647, 651-52 (6th Cir. 2003)

("If a plaintiff receives notice of an affirmative defense by some means other than

pleadings, the defendant's failure to comply with Rule 8(c) does not cause the

plaintiff any prejudice." (*citing Moore, Owen, Thomas & Co.*, 992 F.2d at 1445)).

154.   It is undisputed that Textron took a long time over the course of this

litigation to raise the affirmative defense of waiver.

- Textron could have raised, but was not required to raise, this defense in its
  motion to dismiss filed on April 20, 2012;

- Textron could have raised, but was not required to raise, this defense as an
  alternative ground to affirm dismissal of the conspiracy count in its briefing
  before the Sixth Circuit in 2016;

- Textron could have raised, but was not required to raise, this defense in its
  motion to dismiss the second amended complaint filed on
  December 19, 2016;

- Textron could have raised this defense in its answer filed on June 30, 2017;
  or

- Textron could have moved for leave to file an amended answer under
  Bankruptcy Rule 7015 and Civil Rule 15(a)(2) to include this defense at any
  time after June 30, 2017.

Instead, Textron did not raise the affirmative defense of waiver until it filed its

motion for summary judgment on November 3, 2017.

155.   Both the Trustee and Textron are represented by many skilled and well-paid attorneys.  Ironically, Textron's attorneys now assert that there can be no prejudice to the Trustee since the evidence of a complete release has been hiding in plain sight for at least six years, and the Trustee's attorneys should have anticipated this affirmative defense that Textron's own lawyers failed to raise until just recently.

156.   The district court has broad discretion, and might well be within its sound discretion if it allows Textron to raise the affirmative defense or deems the affirmative defense waived.  *See Sushka,* 117 F.3d at 969.

157.   While Textron could have raised this affirmative defense as early as 2012, it was not required to do so under Bankruptcy Rule 7008 and Civil Rule 8(c) until it filed its answer on June 30, 2017, a little more than four months before it first raised the affirmative defense of release in its motion for summary judgment on November 3, 2017.  Moreover, unlike at least one other circuit court, the Sixth Circuit does not insist that a party first move for leave to amend its answer before considering the merits of a previously unraised affirmative defense. *Compare*, *e.g.*, *Sushka,* 117 F.3d at 969*, with Harris v. Sec'y, United States Dep't of Veterans Affairs*, 126 F.3d 339, 345 (D.C. Cir. 1997) ("In order to preserve the notice purpose of Rule 8(c) and the discretionary structure of Rule 15(a), we hold that Rule 8(c) means what it says: a party must first raise its affirmative defenses

64

in a responsive pleading before it can raise them in a dispositive motion. . . .").

158.   Unlike the affirmative defense of *in pari delicto*, which has been fully developed and the subject of extensive briefing, the affirmative defense of release has had only minimal briefing, particularly when it comes to questions such as prejudice to the Trustee and whether the release is valid or subject to avoidance.

159.   Whether the Trustee has been prejudiced by the delay in raising the affirmative defense of release is unclear.  Unlike in *Rogers*, where the validity of the release itself was undisputed, here the validity of the release remains a point of contention.  For example, the Trustee argues that the release is invalid because it was a part of the civil conspiracy to damage Fair Finance or was done without adequate consideration, or is itself avoidable as a fraudulent transfer.  Ohio's Uniform Fraudulent Transfer Act includes "release" in its definition of "transfer." Ohio Rev. Code Ann. § 1336.01(L).

160.   The undersigned judge does not believe that these issues warrant additional discovery, as these issues are already a part of the Trustee's extensive civil conspiracy allegations.  Nevertheless, should the district court determine that the separate affirmative defense of *in pari delicto* is not dispositive, the district court might benefit from additional briefing on the affirmative defense of release. *See Sushka,* 117 F.3d at 969 (district court delayed trial date in order to respond to and brief affirmative defense); *Hawkins v. Ctr. for Spinal Surgery*,

65

2015 WL 1096970, at *2 (M.D. Tenn. March 11, 2015) (court reopened discovery).

161.    Moreover, if the district court decides that it would benefit from additional briefing on the affirmative defense of release, the district court might also invite briefing on the issue of whether the Trustee, as successor to the debtor, has waived the right to a jury trial on the civil conspiracy claim by virtue of the broad jury trial waiver contained in the 2004 Agreement. *See* Case No. 5:12-CV-987, ECF No. 301, Exhibit H at 22 ("THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS . . . OR ANY OTHER CLAIM OR DISPUTE HEREUNDER OR THEREUNDER."). Litigants may waive their Seventh Amendment right to a jury, provided the waiver is "knowing and voluntary." *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 756 (6th Cir. 1985).

162.    Accordingly, the undersigned judge recommends that the district court grant summary judgment in favor of Textron on the Trustee's civil conspiracy claim based on the defense of *in pari delicto*. As this affirmative defense is dispositive, the district court need not address Textron's alternative

66

affirmative defense of release. Indeed, the Trustee's arguments for invalidating the release—*e.g.*, that the release is itself avoidable as a fraudulent transfer or invalid as an act in furtherance of the civil conspiracy—only reinforce Textron's contention that the Trustee's civil conspiracy claim is barred under the defense of *in pari delicto*.

### *D. The Trustee's Claims for Equitable Subordination or Disallowance of Any Potential Textron Proof of Claim - Counts III and IV*

163.    Count III of the second amended complaint seeks equitable subordination of any filed or scheduled claims of Textron under 11 U.S.C. § 510(c). Count IV seeks disallowance of any filed or scheduled claims of Textron under 11 U.S.C. § 502(d). As Textron has yet to file a proof of claim, these counts are relevant only if (1) the Trustee wins a judgment on Count I of the second amended complaint, and (2) Textron files a proof of claim as an unsecured creditor within 30 days after that judgment has become final. *See* Bankruptcy Rule 3002(c)(3).

164.    If, as the undersigned judge recommends, the district court denies Textron's motion for summary judgment with respect to Count I of the second amended complaint, then Counts III and IV will remain pending until after the judgment on Count I has become final. *See* Bankruptcy Rule 3002(c)(3). Should the district court instead grant summary judgment in favor of Textron on Count I

67

of the second amended complaint, then Counts III and IV can be dismissed as moot.

## II. THE TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

165.   The Trustee's  motion for partial summary judgment seeks summary judgment only on a narrow issue with respect to his actual fraudulent transfer claim (Count I).  Specifically, the Trustee seeks summary judgment on whether the debtor's transfers and obligations under the 2004 Agreement with Textron were in furtherance of a Ponzi scheme and thus made with the actual intent to hinder, delay, or defraud the debtor's creditors under Ohio Revised Code § 1336.04(A)(1). Adv. Pro. 12-5101, ECF No. 223 at 1.  The Trustee does not seek summary judgment on any theory of liability other than what is commonly referred to as the "Ponzi scheme presumption."  For example, the Trustee is not seeking to establish, through summary judgment, an actual intent to hinder, delay, or defraud creditors based on an "all relevant factors/badges of fraud" analysis under Ohio Revised Code § 1336.04(B).

166.   As noted above, the undersigned judge recommends that the district court deny Textron's own motion for summary judgment with respect to the Trustee's theory for actual fraudulent transfers based on novation.  Should the district court instead decide to grant Textron's motion for summary judgment with respect to the Trustee's actual fraudulent transfer claim in its entirety—*e.g.*, on all

68

three theories for liability under Count I—then the Trustee's motion for partial

summary judgment can be denied as moot.

167. As will be explained more fully below, the undersigned judge

recommends that the district court deny the Trustee's motion for partial summary

judgment. In short, while there is extensive and perhaps even compelling

evidence that the debtor was operating as a Ponzi scheme as of January 6, 2004, a

reasonable jury could find that the Trustee has failed to establish this by clear and

convincing evidence.

### *Ohio's Version of the Uniform Fraudulent Transfer Act*

168. As noted earlier:

> Under Section 1336.04(A)(1) of the Ohio Revised Code, a plaintiff
> can prove fraudulent transfer by showing three elements: "(1) a
> conveyance or incurring of a debt; (2) made with actual intent to
> defraud, hinder, or delay; (3) present or future creditors." *Blood*
> [834 N.E.2d at 367]."

*Nat'l Credit Union Admin. Bd.*, 2017 WL 4535070 at *7.

169. Under Ohio's version of the Uniform Fraudulent Transfer Act, intent

must be established by clear and convincing evidence. *Blood*, 834 N.E.2d at 367-

68 ("creditor seeking to set aside a transfer as fraudulent has the ultimate burden

of proving, by clear and convincing evidence, the debtor's intent pursuant to

R.C. 1336.04(A)(1)"). *See also* ¶¶ 60-62 above.

*The Ponzi Scheme Presumption*

170.   The district court's 2015 decision contains extensive discussion of the Trustee's actual fraudulent transfer claims against Fortress and the Ponzi scheme presumption.  The district court's legal analysis constitutes law of the case, at least with respect to claims under Ohio's Uniform Fraudulent Transfer Act.  As such, the district court's decision provides an appropriate framework for analyzing the Trustee's motion for partial summary judgment.

171.   The district court explained:

> "Actual fraudulent conveyance claims . . . turn on the intent of the debtor in making the transfer; the state of mind of the transferee is irrelevant." *In re Bayou Group, LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010).  "With respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud for purposes of recovering payments under §§ 548(a) and 544(b)." *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011); *see also Conroy v. Shott*, 9 Ohio Misc. 117, 363 F.2d 90, 92 (6th Cir. 1966) ("it will be immediately noted that an intent to defraud on the part of [the debtor] must first be presumed to have existed [in that the debtor was operated as a Ponzi scheme.]").  This is so because a Ponzi scheme will eventually collapse.  Thus, intent is presumed because the debtor undeniably knows that "future investors will not be paid," thus evidencing an intent to defraud creditors.  *In re Independent Clearing House Co.*, 77 B.R. 843 (D. Utah 1987).

> Thus, to the extent the Trustee is able to establish that Fair Finance constituted a Ponzi scheme, fraudulent intent will be inferred. The parties dispute the requirements of establishing the existence of the Ponzi scheme.  In [*Canyon Systems*], 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006), the court enunciated a four-part test used to determine whether a Ponzi scheme exists:

To prove that [Debtor] engaged in a Ponzi scheme, the Trustee must establish that: (1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.

The bankruptcy court recommends that the Court find that this test is too narrow and runs "counter to the great weight of authority analyzing Ponzi schemes." According to the Trustee and the bankruptcy court, a Ponzi scheme is "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors." *In re Bullion Reserve of North America*, 836 F.2d 1214 (9th Cir. 1988); *see also, In re Bayou Group, LLC*, 362 B.R. 624, 634 (Bkrtcy. S.D.N.Y. 2007) ("label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud"). On the other hand, Fortress asks that the Court adopt the four-part test set forth in *Canyon Systems*.

Upon review, the Court accepts the bankruptcy court's recommendation that the Ponzi scheme presumption is not limited to the test set forth in *Canyon Systems*. The Court finds, however, that the elements set forth in *Canyon Systems* may be relevant as factors to assess in determining whether a Ponzi scheme exists. No one factor, however, is controlling. In addition to these factors, other factors may be relevant including the collapse of the business upon the loss of investors and the lavish lifestyle of the individuals operating the scheme. *See, e.g., In re Marroquin*, 441 B.R. 586, 599 (Bankr. N.D. Ohio 2010).

*Bash v. Textron Financial*, 524 B.R. at 756-57.

172.   The district court must now consider the same factors it identified in

its 2015 decision to determine whether the debtor was operating as a Ponzi scheme

as of January 6, 2004.  Or, to put it in the context of a summary judgment ruling,

the district court must determine whether a reasonable jury could find that the Trustee has failed to establish by clear and convincing evidence that the debtor was operating as a Ponzi scheme as of January 6, 2004.

173.   The Trustee makes a compelling case that the debtor was operating as a Ponzi scheme as of January 6, 2004.  The Trustee emphasizes three core facts that the district court identified in its 2015 decision, which addressed the debtor's condition as of the time that Fortress entered into a revolving loan agreement with the debtor in February of 2008.  The Trustee asserts that these three core facts were equally true as of January 6, 2004.  Adv. Pro. 12-5101, ECF No. 223 at 17.

174.   According to the Trustee, the three core facts are:

(1) Durham and Cochran were removing cash from Fair Finance at exorbitant speeds to fund lavish lifestyles and related-party loans;

(2) From 2002 through 2004, Fair Finance dramatically increased the amount of V-Notes sold over time, while lulling investors into holding onto their investments with rate increases; and

(3) At least as of December 3, 2004, through the FBI raid, Fair Finance could only pay all of the interest and principal owed to the V-Noteholders by using the proceeds from the sale of new V-Notes to new V-Noteholders.

Adv. Pro. 12-5101, ECF No. 223 at 17.

175.   In response, Textron cites several facts which suggest that the debtor was actually a "solvent" business as of January 6, 2004, and notes that the district court's 2015 decision actually identified six relevant factors—the four from

72

*Canyon Systems*, plus two addition factors—and indicated that no one factor is controlling. *Bash v. Textron Financial*, 524 B.R. at 757; Adv. Pro. 12-5101, ECF No. 230 at 32-35.

176. The evidence with respect to these factors is discussed below.

177. While the factual record, including expert reports, is much more extensive and nuanced than this brief summary, it is important to remember that the evidence must be construed in a light most favorable to Textron, the nonmoving party. Furthermore, if a genuine issue of material fact exists, the presence of other evidence in favor of the movant should not change the analysis regarding the Trustee's motion for partial summary judgment.

<u>(1) Deposits Were Made by Investors</u>

178. Textron concedes that deposits were made by investors in the form of V-Notes. Adv. Pro. 12-5101, ECF No. 230 at 33. However, Textron is quick to add that the debtor used V-Notes to fund the company's factoring business even before Durham and Cochran acquired the business.

<u>(2) The Debtor Conducted Little or No Legitimate Business Operations as Represented to Investors</u>

179. Textron insists that the debtor did conduct legitimate business operations. Adv. Pro. 12-5101, ECF No. 233 at 33. For example, the debtor's former president, John Head, testified that the factoring business was "growing" at

73

least through 2005 and was "[h]ighly profitable" through 2008.

Adv. Pro. 12-5101, ECF No. 232, Exhibit A at 49-50 (Head Dep.); *see also*

Adv. Pro. 12-5101, ECF No. 233, Exhibit A at 25-26 (Declaration of Rebekah A.

Smith). According to Smith's report, revenue from the debtor's consumer account

receivables grew from just under $13 million in 2002 to just over $14 million in

2006. Adv. Pro. 12-5101, ECF No. 233, Exhibit A at 26.

(*3*) *The Purported Business Operations Produced Little or No Profits or Earnings*

180. Textron maintains that the debtor's business operations generated

profits through at least 2004. Expert opinions from both parties suggest that the

debtor was generating net income through at least the end of 2004.

Adv. Pro. 12-5101, ECF No. 233, Exhibit A at 27-28; Adv. Pro. 12-5101,

ECF No. 223, Exhibits 7-8 (Expert Report of Howard Klein). Copies of Klein's

August 31, 2017, expert report are also included in the record at

Adv. Pro. 12-5101, ECF No. 214 at Exhibit A, and Case No. 5:12-cv-987,

ECF No. 305 at Exhibit A.

181. These statements contrast with the district court's holding regarding

the debtor's operations in 2008, when the debtor's non-V-Note proceeds "could by

no means sustain the amounts due investors." *Bash v. Textron Financial*, 524 B.R.

at 758.

## (4) The Source of Payments to Investors Was Cash Infused by New Investors

182.   The "defining feature" of a Ponzi scheme is that it "operate[s] strictly by paying earlier investors with money tendered by later investors." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 475 (6th Cir. 1999).

183.   Textron's expert, Rebekah Smith, opines that "at least [through the end of 2004], Fair Finance was generating enough proceeds [from its factoring business] to not only cover V-Note interest and pay down the Revolver but had excess proceeds sufficient to cover at least some V-Note principal obligations." Adv. Pro. 12-5101, ECF No. 233, Exhibit A at 29.  Howard Klein, one of the Trustee's experts, conceded that, through the end of 2003, the debtor's factoring business had "sufficient income" to cover V-Note interest payments.  *See* Adv. Pro. 12-5101, ECF No. 232, Exhibit DDDD at 117-18 (Klein Dep.).

184.   Rebekah Smith also opines that under any of the three generally accepted accounting tests for evaluating a company's solvency—the "Balance Sheet Test," the "Cash Flow Test," and the "Capital Adequacy Test"—"Fair Finance was solvent, and not in imminent danger of becoming insolvent, through at least December 31, 2004."  Adv. Pro. 12-5101, ECF No. 233, Exhibit A at 2, 6-23.  Smith based her findings on the collateral analyses performed in 2004 by the debtor's auditors, BGBC Partners and Somerset CPAs.  *Id*. at 37-41.

185.   In addition, the Trustee's own expert, Howard Klein, has stated under

75

penalty of perjury that:

> At least as of December 31, 2004 through the FBI raid, Fair Finance could only pay all of the interest and principal owed to V-Noteholders by using the proceeds from the sale of new V-notes to new V-Noteholders.

Adv. Pro 12-5101, ECF No. 232, Exhibit FFFF at 15. Construing this evidence in a light most favorable to Textron, the sworn statement of the Trustee's own expert provides evidence that the debtor was not operating as a Ponzi scheme as of January 6, 2004.

186. Klein now opines something different in his expert report:

OPINION 4

> 122. From at least October, 31, 2003 through 2009, Fair Finance exhibited the characteristics of a Ponzi scheme.

Adv. Pro. 12-5101, ECF No. 223, Exhibit 7 at 3. *See generally id.* at 65-87 (detailing the bases and reasons supporting Opinion 4 of Klein's expert report).

187. In his reply brief, the Trustee asserts that Klein is not contradicting his earlier opinion that used a date of "no later than December 31, 2004." Adv. Pro. 12-5101, ECF No. 243 at 12 (noting that "that time period was not relevant to the Trustee's claim against Fortress"). But Fortress did not become a secured lender of the debtor until February of 2008, which suggests that Klein had no reason to pick a date three years before Fortress ever began loaning money to the debtor unless that date had some particular relevance.

76

188.  Indeed, the text of Klein's 2013 sworn statement immediately preceding his use of the "no later than December 31, 2004" language provides appropriate context.  It suggests that Klein believed Fair Finance to be profitable through the end of 2004:

> Excluding the accrued interest income that was not actually paid by [Fair Holdings, Inc.] and the related party loan borrowers and before any expense for the write-off of any related party loans, Fair Finance's income statements reflect a profit of approximately $0.4 million for the year ending December 31, 2004, and losses of $2 million for the year ending December 31, 2005, $4 million for the year ending December 31, 2006, $10.2 million for the year ending December 31, 2007, $18.6 million for the year ending December 31, 2008, and $13.2 million as of September 30, 2009.  At least as of December 31, 2004 through the FBI raid, Fair Finance could only pay all of the interest and principal owed to V-Noteholders by using the proceeds from the sale of new V-Notes to new V-Noteholders.

Adv. Pro 12-5101, ECF No. 232, Exhibit FFFF at 15.

189.  In any event, questions of credibility and the weighing of the evidence are jury functions, not those of a judge deciding a motion for summary judgment.

### (5) The Collapse of the Business Upon the Loss of Investors

190.  Textron concedes that the debtor collapsed in late 2009, but insists that this fact says nothing about when the Ponzi scheme began.

### (6) The Lavish Lifestyle of the Individuals Operating the Scheme

191.  Textron does not dispute that Durham and Cochran lived lavish

77

lifestyles, but essentially argues that the evidence of lavish lifestyles for the period before January 6, 2004, pales in comparison to the evidence for the period after that date. Adv. Pro. 12-5101, ECF No. 230 at 35. For example, Textron notes that Durham only owned 11 cars as of September 2003, a number which later grew to 63. On the other hand, one of those 11 cars was a 1929 Duesenberg valued at $800,000. Adv. Pro. 12-5101, ECF No. 223, Exhibit 7 at 39. Klein's Report also indicates that in October 2003 Durham purchased a 98-foot yacht for over $5.5 million. *Id*. at 38.

### *Other Factors, Including Criminal Convictions*

192. Textron does challenge the Trustee's assertion that "Durham's and Cochran's criminal convictions provide additional, irrefutable evidence of the Ponzi scheme and Fair Finance's fraudulent intent." Adv. Pro. 12-5101, ECF No. 223 at 27. Textron specifically notes that the criminal case did not concern activity that occurred before January 6, 2004. Rather, the superseding indictment stated that the "scheme to defraud" occurred "[b]etween approximately February 2005 . . . through the end of November 2009." Adv. Pro. 12-5101, ECF No. 232, Exhibit HHHH at 4.

193. Furthermore, the superseding indictment specifically charged that the scheme to defraud investors occurred "[b]etween approximately February 2005, the exact date being unknown to the Grand Jury," and "the end of November

78

2009." *Id.* at ¶ 15. Thus, the indictment, when construed in a light most favorable

to Textron, actually *supports* Textron's assertion that the debtor was not operating

as a Ponzi scheme as of January 6, 2004.

194. True, there are other portions of the superseding indictment that

support the Trustee's claim that the debtor acted with an intent to hinder, delay, or

defraud investors prior to February 2005. For example, the superseding

indictment states:

> 18. Shortly after purchasing Fair, DURHAM and COCHRAN
> began to alter Fair's business. Instead of using the majority of the
> money that Fair raised from investors through the sale of investment
> certificates for Fair's consumer finance business, DURHAM and
> COCHRAN began using investor money to make loans to themselves,
> to their family, friends, and acquaintances, and to businesses they
> owned or controlled.
>
> . . . .
>
> 22. The loans that DURHAM and COCHRAN made to
> businesses that later failed and were never repaid, and the regular
> infusions of Fair investor money used to support DURHAM and
> COCHRAN's lifestyles, personal expenses, and the businesses they
> owned or controlled, caused Fair's financial condition to steadily and
> substantially deteriorate.

Adv. Pro. 12-5101, ECF No. 23, Exhibit HHHH at 5-6. Nevertheless, the

superseding indictment and the criminal convictions of Durham, Cochran, and

Snow are, at best, bits of evidence for a civil jury to weigh among all other

evidence in deciding whether the Trustee has established the element of fraudulent

12-05101-aih     Doc 244     FILED 02/23/18     ENTERED 02/23/18 14:06:21     Page 79 of 95

intent by clear and convincing evidence.

195.   There may be little doubt that Durham and Cochran intended to hinder, delay, or defraud the debtor's investors and other creditors as of January 6, 2004;  however, the only theory at issue for the Trustee's motion for partial summary judgment is whether the debtor was operating as a Ponzi scheme as of January 6, 2004.

196.   This latter determination presents a challenge when, as is the case here, someone takes over a legitimate business, siphons money, and ultimately needs to rely on new investors to pay existing investors as opposed to relying on profits from the legitimate business.  At what point precisely does the business become a Ponzi scheme?

197.   The undersigned judge does not believe that the debtor should be deemed to be "operating as a Ponzi scheme" at a time when the legitimate business had enough profits to pay existing investors in full.  If, hypothetically, Durham and Cochran died in a plane crash on January 6, 2004, and the debtor would have been able to pay all existing investors in full from legitimate business profits, would it be appropriate to say that the debtor was operating as a Ponzi scheme at that time?

198.   Put another way, if by its nature a Ponzi scheme is destined to collapse, and if the debtor was still in a position to pay existing investors in full

80

from legitimate business profits as of January 6, 2004, then how could the debtor

be deemed to be operating as a Ponzi scheme at that time?

199.   The Sixth Circuit decision in *Conroy*, 363 F.2d at 90, is instructive.

In *Conroy*, the Sixth Circuit quoted extensively from and generally adopted the

ruling of the district court that had granted summary judgment to the bankruptcy

trustee on a case involving a Ponzi scheme.

> "Stickler's scheme was the essence of simplicity, not to say of
> stupidity. At its inception he borrowed from A, then borrowed from B
> to repay A. The inducement to B was a high rate of interest on a short
> term, whereupon it became necessary to borrow from C to repay B.
> This operation continued, with ever increasing rates of interest and
> shortening of the loan periods until hundreds of transactions
> involving millions of dollars had been entered into by Stickler.
> However, since he was insolvent from the moment of the making of
> the first loan, and since there has never been a suggestion that any
> source of income existed except new loans (if such may be considered
> 'a source of income'), the question of intent to defraud is not
> debatable."

*Id.* at 92 (quoting from the district court's decision).

200.   In *Conroy*, there was no "suggestion that any source of income

existed except the new loans." *Id.*  In the present case, however, it is undisputed

that debtor's legitimate factoring business generated income.  What is disputed is

the date that the income from the debtor's legitimate factoring business was no

longer sufficient to pay the debtor's ever-increasing obligations to its

V-Noteholders.

201.   Again, a negative answer as to the Ponzi scheme presumption at the summary judgment phase does not necessarily mean that Durham and Cochran lacked an intent to hinder, delay, or defraud creditors as of January 6, 2004.  It simply means that the Trustee has yet to establish the Ponzi scheme presumption as a matter of law.

202.   After construing the evidence of the factors that the district court identified in its 2015 decision in a light most favorable to Textron, the undersigned judge recommends that the district court deny the Trustee's motion for partial summary judgment.  While there is extensive and perhaps even compelling evidence that the debtor was operating as a Ponzi scheme as of January 6, 2004, whether the Trustee can meet his burden of proof on this issue is ultimately a question for the jury.  *Anderson v. Liberty Lobby*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

### *"In Furtherance of" the Ponzi Scheme*

203.   As noted above, the undersigned judge recommends that the district court let a jury decide whether the Trustee can establish by clear and convincing evidence that the debtor operated as a Ponzi scheme as of January 6, 2004.  If the district court agrees, then the district court need not decide at this summary judgment phase whether the transfers and obligations to Textron in the

82

2004 Agreement were "in furtherance of" a Ponzi scheme.

204.   Nevertheless, should the district court decide as a matter of law that the debtor operated as a Ponzi scheme as of January 6, 2004, then the district court will need to determine whether, as a matter of law, the transfers and obligations to Textron in the 2004 Agreement were "in furtherance of" a Ponzi scheme.

205.   Again, the district court's 2015 decision provides an appropriate framework for analyzing whether such transfers and obligations were "in furtherance of" a Ponzi scheme.

206.   The district court explained:

> Fortress argues that the Trustee cannot show that the Fortress transfers were made "in furtherance" of the Ponzi scheme. The Court finds that the "in furtherance of" element does not pose a difficult hurdle once a Ponzi scheme is established. This is because, by its very nature, Ponzi schemes are destined to collapse. Thus, unless the transfers are wholly apart from the Ponzi scheme, the transfer will in all likelihood contribute to the scheme in some fashion. Again, Fortress argues that the transfers were not "in furtherance" of the Ponzi scheme, but instead, furthered Fair Finance's legitimate receivables business. According to Fortress, Finance commingled funds and, therefore, there is a question of fact as to whether proceeds from the sales of the Customer Accounts were "in furtherance" of the Ponzi scheme. Fortress also claims that there is simply no connection between its loan to Fair Finance SPE and the fraud on the investors. The Trustee argues that without the Fortress loan, the Ponzi scheme would have collapsed much earlier. Thus, all transfers related to the Fortress loan were necessarily "in furtherance" of the Ponzi scheme. According to the Trustee, if Fair Finance SPE had not made repayments on the loan, then the funding would have been cut off and the Ponzi scheme discovered.

Upon review, the Court finds that, as a matter of law, the transfers made to Fortress were done "in furtherance" of the Ponzi scheme. The Trustee points to evidence showing that, not only was the existence of Fair Finance dependant on the Fortress loan, but absent the proceeds from the loan, Fair Finance would have been unable to pay back its investors . . . Based on this alone, the Court finds that maintaining the relationship with Fortress, including making the transfers at issue in the case were done to further the Ponzi scheme. . . . In all, the Court finds that the transfers to Fortress were "in furtherance" of the Ponzi scheme.

*Bash v. Textron Financial*, 524 B.R. at 758-59.

207.    Should the district court decide as a matter of law that the debtor operated as a Ponzi scheme by January 6, 2004, then the undersigned judge recommends that the district court also decide, as a matter of law, that the transfers and obligations to Textron in the 2004 Agreement were "in furtherance of" a Ponzi scheme.

208.    If the debtor was operating as a Ponzi scheme as of January 6, 2004, then the debtor's transfers and obligations to Textron are essentially no different from the debtor's later transfers and obligations to Fortress, which the district court has already determined were "in furtherance of a Ponzi scheme" as a matter of law. *See Bash v. Textron Financial*, 524 B.R. at 758-59.

### *The District Court Should Not Bifurcate Trial or Otherwise Defer a Ruling on the Issue of Actual Fraudulent Intent*

209.    In its brief opposing the Trustee's motion for partial summary judgment, Textron seems to suggest that the district court defer any ruling on the

84

issue of actual fraudulent intent until after the district court renders a decision on whether there was a novation in 2004 that extinguished the 2002 lien, thereby creating a transfer within the meaning of Ohio's version of the Uniform Fraudulent Transfer Act. Adv. Pro. 12-5101, ECF No. 230 at 22-24.

210. While it is true that Trustee cannot prevail under his novation theory for Count I without such a determination, the undersigned judge strongly advises against a bifurcated trial. As the *Fair Finance* bankruptcy case begins its ninth year, general unsecured creditors deserve finality, whether that means recovering some additional money on their claims or recovering nothing further. A bifurcated trial might require yet another appeal and remand, further delaying any final determination on these claims.

211. Both the Trustee and Textron had an opportunity to seek a determination of "no just reason for delay" under Civil Rule 54(b) and Bankruptcy Rule 7054 when the district court dismissed all claims against Textron in 2012, but did not do so. Instead, these dismissed claims sat dormant until July of 2015, when all claims against the remaining defendants were finally decided, and the Sixth Circuit reinstated these dismissed claims in August 2016.

212. A firm trial date on all remaining claims is the best way to bring finality both to this litigation and to the underlying bankruptcy case. Accordingly, the undersigned judge recommends that the district court deny the Trustee's

motion for partial summary judgment.

## III. TEXTRON'S MOTIONS *IN LIMINE*

213.   In conjunction with the summary judgment briefing, Textron has

moved to preclude the testimony of several witnesses that the Trustee has

identified as experts pursuant to Civil Rule 26(a)(2) and Bankruptcy Rule 7026.

Depending on the district court's disposition of the pending summary judgment

motions, some or all of these motions *in limine* may be moot.  As explained more

fully below, the undersigned judge recommends that the district court defer ruling

on the motions *in limine* until after the district court has conducted a preliminary

hearing under Evidence Rule 104 shortly before commencing a jury trial.

214.   In November 2017, Textron filed motions to preclude the testimony

of four of the Trustee's expert witnesses:

- Motion to preclude certain testimony of Howard Klein
  (Case No. 5:12-CV-987, ECF No. 304);

- Motion to preclude the testimony of Thomas Geyer (Case No. 5:12-CV-987,
  ECF No. 306);

- Motion to preclude the testimony of Richard Palmieri
  (Case No. 5:12-CV-987, ECF No. 308); and

- Motion to preclude the testimony of Charles Heflin (Case No. 5:12-CV-987,
  ECF No. 310).

The Trustee filed responses in opposition to all of these motions

(Adv. Pro. 12-5101, ECF Nos. 235, 236, and 237).  Textron filed replies in support

86

of its motions (Case No. 5:12-CV-987, ECF Nos. 317, 318, and 319).

### *A. Summary of Opinion Testimony Sought to be Excluded*

### *Mr. Klein*

215.   Mr. Klein is a certified insolvency and reorganization accountant and a certified fraud examiner.  In his report, he offers a number of opinions, including opinions on Textron's lack of due diligence and the inappropriateness of certain actions taken by Textron in light of alleged warning signs of fraud during the course of Textron's lending relationship with the debtor.  Adv. Pro. 12-5101, ECF No. 223, Exhibit 7 at 3-4.  Textron argues that Mr. Klein is not qualified to opine on these particular issues.  Case No. 5:12-CV-987, ECF No. 304 at 3.

216.   Klein's opinions on these issues have no bearing on either Textron's motion for summary judgment or the Trustee's motion for partial summary judgment, although they may well be relevant to issues to be decided at trial.

### *Mr. Geyer*

217.   Mr. Geyer is a securities law attorney who has worked for private law firms, the Ohio Division of Securities (1994-2000), and the Ohio Department of Commerce.  In his report, he offers his opinion on what the Ohio Division of Securities would have done if it had known what Textron knew regarding Fair Finance's operations and finances.  Adv. Pro. 12-5101, ECF No. 234, Exhibit RRRR at 7, 11-12.  Textron argues that this testimony is inadmissible

87

because it is speculation as to "what a third party would have done under a hypothetical set of facts." Case No. 5:12-CV-987, ECF No. 306 at 3.

218. Mr. Geyer's opinion testimony is potentially relevant only to Textron's *in pari delicto* affirmative defense. Even then, his opinion testimony would only be relevant if the district court were to accept the Trustee's meritless contention that a state regulator outside the corporation could constitute an innocent insider sufficient to avoid application of the sole actor doctrine under Ohio law. Therefore, his opinion has no bearing on the undersigned judge's recommendation as to either of the pending motions for summary judgment.

## *Mr. Palmieri*

219. Mr. Palmieri has over 45 years of experience in asset-based lending, including serving as director of the Commercial Finance Association. In his report, he offers his opinion on whether the revolving line of credit that Textron provided to Fair Finance from 2002 to 2007 was in accordance with industry custom and practice. Adv. Pro. 12-5101, ECF No. 234, Exhibit WWW at 4-16. In addition, Mr. Palmieri would testify that the parties' 2004 Agreement was actually a new agreement rather than a renewal. *Id*. at 16-17.

220. Textron argues that the Trustee has not shown that Mr. Palmieri's testimony will be relevant and reliable. In addition, Textron argues that Mr. Palmieri is not qualified to testify regarding whether the 2004 Agreement

88

constituted a new loan or a novation. Case No. 5:12-CV-987, ECF No. 308 at 3.

221. Mr. Palmieri's opinion testimony is potentially relevant only to the portion of Textron's motion for summary judgment addressing the Trustee's theory for actual fraudulent transfers based on novation. Nevertheless, his opinion has no bearing on the undersigned judge's recommendation to deny Textron's motion for summary judgment as to the Trustee's theory based on novation. The facts underlying Mr. Palmieri's opinions are already a part of the evidentiary record, regardless whether his opinion testimony is permitted or excluded. Plus, unless the evidence as to whether Textron's actions in connection with the 2004 Agreement were in accordance with industry custom and practice is "clear and definite," *see* 834 F.3d at 667, it adds little to the question whether the 2004 Agreement extinguished the security interest granted in the 2002 Agreement.

## *Mr. Heflin*

222. Mr. Heflin has over 30 years of combined experience in asset-based lending, banking, and factoring, including being the president and CEO of a small bank. In his report, he offers his opinion on Textron's adherence to industry standards and commonly accepted industry practices and procedures in the field of asset based lending. Adv. Pro. 12-5101, ECF No. 234, Exhibit XXX at 2. In addition, he states that Textron treated the 2004 Agreement as a new loan and not a renewal of the original 2002 Agreement. *Id*. at 9. Textron argues that the

89

Trustee has not shown that Mr. Heflin is qualified to offer opinion testimony and has not shown that Mr. Heflin's testimony will be relevant and reliable. Case No. 5:12-CV-987, ECF No. 310 at 3.

223.  As with Mr. Palmieri's opinion testimony, Mr. Heflin's opinion testimony is potentially relevant only to the portion of Textron's motion for summary judgment addressing the Trustee's theory for actual fraudulent transfers based on novation.  Similarly, Mr. Heflin's opinion has no bearing on the undersigned judge's recommendation to deny Textron's motion for summary judgment as to the Trustee's theory based on novation.  Nor would the undersigned judge's recommendation be altered by the presence or absence of Mr. Heflin's opinion that Textron treated the 2004 loan as a new loan and not a renewal of the original 2002 loan.  Moreover, the facts underlying Mr. Heflin's opinions are already a part of the evidentiary record regardless whether his opinion testimony is permitted or excluded.  Plus, unless the evidence as to whether Textron's actions in connection with the 2004 Agreement were in accordance with industry custom and practice is "clear and definite," *see* 834 F.3d at 667, it adds little to the question whether the 2004 Agreement extinguished the security interest granted in the 2002 Agreement.

## B. Standard for Admissibility of Opinion Testimony

224.  Rule 702 of the Federal Rules of Evidence governs admissibility of

90

expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

225.    Under *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1993), the trial judge serves as a "gatekeeper" to determine whether an expert's testimony is reliable and relevant. "The trial judge has considerable leeway in deciding how to go about determining whether particular expert testimony is reliable." *United States v. Sanders*, 59 Fed. Appx. 765, 767 (6th Cir. 2003) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)). The gatekeeping function applies not only to scientific testimony, but to all expert testimony involving technical or other specialized knowledge. *See Kumho Tire,* 526 U.S. at 147; *see also Steigerwald v. BHH, LCC*, No. 1:15 CV 741, 2016 WL 6962593, at *1 (N.D. Ohio Nov. 29, 2016) (Gaughan, J.).

226.    Pursuant to Federal Rule of Evidence 104(a), the trial judge must decide if the expert testimony is admissible under Rule 702. *Daubert*, 509 U.S. at 592. This determination requires a "preliminary assessment," but the Supreme

91

Court did not explicitly require that the determination occur at a pretrial hearing. *Id*.

227.   The nature of motions *in limine* is such that many of the issues presented in such a motion are context-specific.  A court's determination of the propriety of an objection often may be made only in the framework of a trial.  *In re Commercial Money Ctr., Inc.*, 737 F. Supp. 2d 815, 822 (N.D. Ohio 2010) (O'Malley, J.).  Rulings on motions *in limine* frequently should be deferred to the trial stage:

> The court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. . . . Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.

*Id.* (quoting *Ind. Ins. Co. v. GE*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) (Katz, J.)).

228.   "Ultimately, whether a motion *in limine* is granted or overruled is a matter left to the sound discretion of the trial court."  *Id.* (quoting *Corporate Commc'n. Servs. of Dayton, LLC v. MCI Commc'ns. Servs.*, 2009 WL 4680507, *2 (S.D. Ohio Dec. 3, 2009)).

229.   The undersigned judge recommends that the district court set a firm trial date and hold a preliminary hearing under Evidence Rule 104 addressing the motions *in limine* shortly before the trial.

92

230. This strategy promotes judicial economy for several reasons. First, if the undersigned judge were to make recommendations on the merits of the *Daubert* issues at this stage without knowing how the district judge will decide the summary judgment issues, the parties would be required to file objections and responses on the merits of motions *in limine* that might well become moot. Second, the district court is well versed in the *Daubert* standards, so that the views of the undersigned judge are likely to add little value beyond the parties' briefing, which is now complete. Third, the district court will be able to evaluate the witnesses while immersed in the evidentiary issues and with knowledge of exactly which claims and defenses are going forward at trial. Fourth, the preliminary hearing under Rule 104 may be unnecessary if the parties settle this dispute knowing that a jury trial is imminent.

231. As U.S. District Judge (now U.S. Circuit Judge) Thapar indicated in *Douglas v. United States*, No. CIV. 10-26, 2011 WL 2633612 (E.D. Ky. July 5, 2011):

> [T]his is just the summary judgment state of the case. As the First Circuit has cautioned, "the *Daubert* regime should be employed only with great care and circumspection at the summary judgment stage." *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). That is because "[a] trial setting normally will provide the best operating environment for the ... complex factual inquiry required by *Daubert*." *Id.* Thus, "in all but the most clear cut cases," it will be difficult for a court to adequately gauge the reliability of an expert's testimony based on the "truncated record"

93

that is present at the summary judgment stage. *Id.* The Sixth Circuit feels the same way. *See Jahn v. Equine Servs.*, 233 F.3d 382, 393 (6th Cir. 2000) ("A district court should not make a *Daubert* ruling prematurely, but should only do so when the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance.").

*Id.* at *7.

232. Moreover, the opinion testimony that is the subject of these motions *in limine* will not alter undersigned judge's recommendation as to the disposition of the pending motions for summary judgment. *See* ¶¶ 216, 218, 221, and 223 above.

233. Accordingly, the undersigned judge recommends that the district court defer ruling on the motions *in limine* until after the district court has conducted a preliminary hearing under Federal Rule of Evidence 104 shortly before commencing a jury trial.

CONCLUSION

234. For the foregoing reasons, the undersigned judge submits these Proposed Conclusions of Law recommending that the district court:

(1a)  deny Textron's motion for summary judgment with respect to the Trustee's theory for actual fraudulent transfers based on novation (Count I);

(1b)  grant Textron's motion for summary judgment with respect to the Trustee's theories for actual fraudulent transfers not based on novation (Count I);

94

(1c)   grant Textron's motion for summary judgment with respect to the Trustee's civil conspiracy claim (Count II);

(1d)   deny Textron's motion for summary judgment with respect to the Trustee's claims for equitable subordination or disallowance of any potential Textron proof of claim (Counts III and IV);

(2)   deny the Trustee's motion for partial summary judgment; and

(3)   defer ruling on the pending motions *in limine*.

###

## OBJECTIONS

Pursuant to Rule 9033 of the Federal Rules of Bankruptcy Procedure, any party may file objections to these proposed conclusions of law in Adv. Pro. 12-5101 **within 14 days** after being served.  Failure to file objections within the specified time may constitute a waiver of the right to appeal the district court's order. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).  The written objections should identify the specific proposed conclusions objected to and state the grounds for such objection.  A party may respond to another party's objections **within 14 days** after being served with a copy thereof.  Any request for an extension of time should be made to the bankruptcy judge pursuant to Rule 9033.